Thomas D. LANAHAN, Plaintiff,

v.

THE MUTUAL LIFE INSURANCE
COMPANY OF NEW YORK,
Defendant.

No. 96 Civ. 5301(SS).

United States District Court,
S.D. New York.

July 29, 1998.

Kelly, Lucas, Mohen & Pacifico, Locust Valley, NY, Thomas P. Mohen, Donald T. Rave, Sr., for Plaintiff.

Vinson & Elkins, Houston, TX, Douglas E. Hamel, Dewey Ballantine, New York, NY, Harvey Kurzweil, John J. Blood, for Defendant.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff Thomas Lanahan alleges in this suit that the defendant, his former employer, discharged him after twenty years of employment because of his age and in order to avoid payment of certain retirement benefits. Defendant Mutual Life Insurance Company of New York has moved for summary judgment on all claims. For the reasons to be discussed, the Court grants the defendant's motion.

### BACKGROUND

The Mutual Life Insurance Company of New York (MONY) is a national insurance agency headquartered in New York City. MONY first hired plaintiff Thomas D. Lanahan in 1976 as an Agency Manager in charge of its Woodbury, New York office. From there plaintiff moved on to various positions, including Vice President for Marketing, and was ultimately appointed as manager of

MONY's Northern New Jersey agency in 1989, a position he held until his termination on January 31, 1996. Lanahan was 55 years of age at the time of his discharge.

MONY claims, and provides supporting evidence, that Lanahan was fired as agency manager because of his agency's severely declining performance and Lanahan's failure to meet various performance targets for recruiting, sales, and expenses. Lanahan, on the other hand, contends that any failure of his agency to meet performance targets was because of an overall decline in MONY's business and a lack of support from management (including the transfer of high-producing employees and failure to offer Lanahan certain training opportunities); moreover, Lanahan contends the performance targets imposed upon him were contrived to be unrealistically high so has to create an excuse for firing him.

Lanahan brought this suit alleging age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., the New York Human Rights Law (N.Y.SHRL), N.Y. Exec. Law § 290 et seq., and the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. § 10:5–1 et seq., as well as violations of the Employment Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C. § 1101 et seq., and breach of contract. MONY has moved this Court for summary judgment on all claims.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences against the moving party. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997). The Second Circuit has also cautioned that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Id. at 110 (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994)).

### II. Age Discrimination Claims

The ADEA prohibits any employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The NJLAD and the NYSHRL, insofar as is relevant here, prohibit the same conduct and are subject to the same analysis as the ADEA claim. See Keller v. Orix Credit Alliance, 130 F.3d 1101, 1114 n. 5 (3d Cir.1997) (NJLAD); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 913 (2d Cir.1997) (N.Y.SHRL).

In the summary judgment context, claims under the ADEA are analyzed under the same McDonnell Douglas framework as those under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See Renz v. Grey Advertising, Inc., 135 F.3d 217, 221 (2d Cir.1997). The plaintiff first must establish a prima facie case of discrimination; upon doing so, the burden shifts to the defendant to produce "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir.1997). If the defendant does so, the presumption of discrimination raised by the prima face case "drops out of the picture," id. at 559–60, and "the burden then returns to the plaintiff, who must adduce sufficient evidence to allow a rational fact finder to infer that the employer was

motivated in whole or in part by age discrimination." *Norton v. Sam's Club,* 145 F.3d 114, 118, 1998 U.S.App. Lexis 10643, at *9–10, (2d Cir.1998). The plaintiff need not show that "age was the only or even the principal reason for the complained-of employment action," only that "age played a motivating role in, or contributed to, the employer's decision." *Renz,* 135 F.3d at 222.

Despite the fact that the parties dispute whether Lanahan has established a prima facie case, the Court sees no need to address that issue. Since the Second Circuit's decision in *Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997), the only purpose served by the prima facie case is to force the defendant to articulate a non-discriminatory reason for the termination, and thus I agree with my colleague Judge Chin that since it is the rare case in which a defendant will not have proffered such a reason, it is simpler and more straightforward to move directly to the ultimate question. *See Lapsley v. Columbia Univ.,-College of Physicians & Surgeons,* 999 F.Supp. 506, 514–15. At the very least, this Court will assume that Lanahan has established the prima facie case and move on to the ultimate question: has he produced evidence from which a rational factfinder could determine that age was a motivating factor in his discharge? The Court finds that Lanahan has failed to do so.

■ As made clear in *Fisher,* a plaintiff may not survive a motion for summary judgment simply by creating a fact issue as to the pretextual nature of the defendant's proffered reasons for his discharge. Rather, even if MONY's reasons were rejected completely, Lanahan must nevertheless produce evidence from which a reasonable factfinder could infer that a discriminatory motive played a part in his discharge. *See Fisher,* 114 F.3d at 1346–47. Thus, despite the amount of argument Lanahan devotes to disputing MONY's view of his performance, these arguments will not help him, because even were it assumed that he has produced evidence that MONY's criticism of his performance is pretextual, he has produced no evidence from which it could be inferred that these reasons are a pretext for age discrimination.

Lanahan proffers essentially three pieces of evidence that he claims demonstrate a practice of targeting older employees for termination by MONY. First, he claims that various statements made by MONY executives during depositions indicate a "corporate philosophy of '55 and out," Pl. Mem. Opp. at 13. Lanahan's evidence, however, does not support his assertions.

■ Lanahan first points to the deposition of his immediate supervisor, Robert Mayberry, claiming that Mayberry "admitted that Lanahan was targeted for termination upon reaching age 55." Pl. Mem. Opp. at 11. No reasonable reading of Mayberry's deposition testimony supports this conclusion. The key passage upon which Lanahan apparently relies is as follows:

Q: Did you ever advise Tom [Lanahan] to retire at 55?

A [Mayberry]: I had discussions with Tom based on the fact that the agency wasn't doing well on a number of issues where I said the minimum you've got to do is get to 55. . . . I wanted him to know how important that last year was. And the end result of that is you need to do your job so you can get to 55.

. . . . . .

Q: When—did you make a recommendation or a decision with respect to the termination, Tom's termination as agency manager?

. . . . .

A. . . . I was going to terminate Tom at the end of the third quarter of 1995. In fact, I wrote him a letter that was crafted to the fact that I couldn't fire him until after that because I wanted to be sure he got to age 55.

Mayberry Dep. (Pl.Mem.Opp.Exh. A) at 28–29. The reasonable import of this testimony is not that Mayberry wanted to terminate Lanahan *because* he was reaching 55, but rather that the only consideration age played in his termination recommendation was that Mayberry wanted to make sure that Lanahan was not terminated prior to age 55, at which point certain favorable pension provi-

sions would vest. This concern is made crystal clear by Mayberry's later testimony:

Q: Were you looking at Mr. Lanahan any harder than you looked at anybody else?

A: No. I was probably concerned about Tom more than a lot of people.

Q: Why was that?

A: Because I know the financial rewards if you go to 55 as opposed to getting terminated prior to 55. I was well are of those. I know his age. And I know how his agency is doing, which wasn't well. It wasn't good. And I wanted to be sure that—you know, Tom being an old friend and acquaintance of mine—that we made that thing work to get him to age 55. After that, if he was doing the job and he would run along and the agency was doing fine, he could stay as long as he wanted. But I just wanted to be sure he got to age 55.

Mayberry Dep. (Def.Mem.Exh. A) at 127.[1]

Lanahan's other evidence on this point is equally unconvincing. Lanahan refers to the following deposition testimony by Stephen J. Hall, a MONY Senior Vice–President:

Q: Did you ever use a term, "Riding out the cycle to fifty-five"?

A: I did not.

Q: You never used that term?

A: "Riding out the cycle to fifty-five"?

Q: Yes.

A: No. I don't like that term. I resent that term.

Q: Have you ever used it?

A: In a conversation—I mean, if it was, it was in a negative connotation. I do not like that term at all.

Q: Do you know what that term means, have you heard it?

A: Yes, I have.

Q: What does it mean?

A. Most times it refers to managers that are going to ride out the cycle until they reach age fifty-five, and then they're locked into their pension benefit. They have their years of service and they have age fifty-five. Whatever they want to do then at fifty-five. What I don't like about it is I don't like the idea and the connotation that it gives somebody who has responsibility of an agency is going to coast, because what an agency manager does to me is so important. It has nothing to do with age, it has to do with passion, it has to do with vision, it has to do with leadership, it has to do with the pride that the person has in an organization and what they want to build. All it does is, it demeans and it's taking away. You got people that are just coasting it out, riding it out. I don't like it. I just don't like it. I don't like the concept of it.

Q: What you're saying it implies is that there are people who are approaching a given age, which I guess is something of a threshold age for Mutual of New York's retirement plan?

A: Well, yeah, I guess it is.

Q: The connotation, if not the denotation, is that people might be inclined to coast toward that period?

A: That's correct.

Q: I guess what you're saying is, coasting at any age is not good?

A: It's not acceptable.

Q: Is unacceptable.

A: I don't like it.

---

1. In the same vein, Lanahan's attempt to make much of Mayberry's use of the term "riding the saddle" in the following passage is misconstrued:

    Q: Did you ever use the term riding the cycle to 55?
    A: Riding the saddle.
    Q: Riding the saddle?
    A: Yes. Yes. It's a term I developed. I don't know. I read it in the newspaper or somewhere or something. And it seems that the time—at least, in my estimation—the time somebody is most vulnerable is when they're in a cliff situation on a pension program and

they're right to where they need one or two more years to go. And if that happens, I need them to be painfully aware of that cliff so that they don't trip up and hurt themselves.

Mayberry Dep. (Pl.Mem.Opp.Exh. A) at 56. Again, the clear import of Mayberry's use of this term is his concern that an employee nearing a key vesting point in a pension program not allow performance problems to prevent him or her from reaching that vesting point. No reasonable factfinder could conclude that this use of the term evinces a philosophy that older employees should be targeted for termination.

Hall Dep. (Pl.Mem.Opp.Exh. D) at 130–32. There is no reasonable inference of a policy of age discrimination that can be drawn from this testimony. At most, Hall states only that there might be employees who, because of their proximity to retirement age, are "coasting"—i.e., not performing diligently—and that he does not approve of such a practice. Nowhere, however, does he state that he believes this practice is widespread, that either MONY or he has a policy of policing older employees to prevent such behavior, or that he believed Lanahan was guilty of this practice.[2]

■ Second, Lanahan points to statistical evidence that purports to demonstrate systematic dismissal of older workers. Although statistical evidence may give rise to an inference of discrimination, *see Stratton v. Department for the Aging,* 132 F.3d 869, 877 (2d Cir.1997), the evidence provided by Lanahan does not. The first piece of proffered evidence is an affidavit by Lanahan himself which purports to list the sixteen MONY agency managers who, as of 1995, were "grandfathered" into MONY's more lucrative prior pension plan[3] (Lanahan being one of these), their ages, and a statement which says that of these sixteen managers, only five are still employed by MONY. This evidence is insufficient to support an inference of discrimination for a number of reasons.

As a preliminary matter, the Court is inclined to agree with the defendants that this evidence is inadmissible for consideration because Lanahan in his affidavit nowhere explains how it is that he has first-hand knowledge of these facts about MONY personnel. *See* Fed.R.Civ.P. 56(e) ("Supporting and op-

posing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"); Fed. R.Evid. 602; *United States v. Private Sanitation Industry Ass'n,* 44 F.3d 1082, 1084 (2d Cir.1994). There is no assertion, for instance, that he has reviewed MONY personnel records, and there are certainly no such records attached. Lanahan's competence to testify to these facts is far from self-evident. Moreover, MONY has submitted an affidavit from Robert M. Beecroft, MONY's Vice President for Corporate Benefits, which supplies a similar list that differs not insubstantially from Lanahan's.[4] Were it necessary to choose between the two lists supplied in order to decide the motion, the Court would be inclined to disregard Lanahan's affidavit as incompetent to create a fact issue vis-a-vis Beecroft's. It is not necessary, however, because Lanahan's evidence raises no inference of age discrimination.

The group Lanahan has chosen to supply attrition data for are the group of managers who were grandfathered into the old pension plan, not a group based upon the characteristic upon which Lanahan claims discrimination—i.e., age. That is, Lanahan has not shown that managers of a certain *age* have a high attrition rate. At most, then, one could only infer from this evidence a practice of discriminating against managers because of their status as grandfathered into the older, more lucrative pension plan. Such a practice, however, would not be discrimination on the basis of age, and thus not a violation of the ADEA. *See Hazen Paper Co. v. Biggins,*

**2.** Lanahan also presents a deposition by Hall taken in another case in which Hall testifies that he asked another MONY employee, Gary Camp, "where his head was set as far as his sort of riding out the cycle until he was 55." Hall (Camp) Dep. (Pl.Mem.Opp.Exh. E), at 44. Although this suggests that Hall may have been less than completely truthful in stating that he never used the phrase "riding the cycle," Hall's question to Camp as to whether his allegedly poor performance was a result of "riding the cycle" still does not in any way imply a corporate policy of eliminating older employees.

**3.** According to an affidavit by Robert M. Beecroft, MONY Vice–President, Corporate Benefits,

MONY established a new retirement plan on January 1, 1989. Current employees who met certain requirements were given the option to be grandfathered—i.e., they were allowed to elect benefits under either plan. A certain group of agency managers, including Lanahan, who were ineligible under the established criteria were nevertheless grandfathered under a special supplemental retirement plan. *See* Beecroft Aff.

**4.** According to Lanahan, there were 16 managers grandfathered, of whom 5 remain with MONY. According to Beecroft, there were 20, of whom 9 remain.

507 U.S. 604, 610–12, 113 S.Ct. 1701, 1706–07, 123 L.Ed.2d 338 (1993); *Criley v. Delta Air Lines, Inc.,* 119 F.3d 102, 105 (2d Cir.1997).[5] Whether this data will support a conclusion that an ERISA violation has taken place will be discussed *infra.*

■ The other piece of statistical data Lanahan supplies is also from his affidavit. It consists of a table which lists nine MONY agency managers, each aged 55 or over, whose agencies were merged into other agencies run by a younger manager between 1992 and 1997. *See* Lanahan Aff. ¶ 31. This evidence of course suffers from the same lack of foundation as the attrition evidence just discussed. Assuming that the evidence could be verified, however, it still lacks probative value because there is no data by which a comparison could be drawn between MONY's treatment of older agency managers and its treatment of younger ones. That is, Lanahan's affidavit does not state that these were the *only* agency mergers in MONY. In fact, an affidavit supplied by MONY vice-president Charles Leone provides evidence that Lanahan's list is not exhaustive. *See* Leone Aff. (Def. Reply Exh. B). Leone's affidavit, although pertaining only to the Northeast Region (of which Lanahan's agency was a part), lists several agency mergers not included by Lanahan, many of which resulted in agencies run by younger managers being merged into others run by older managers.[6] Given this, there is no way to determine the significance of Lanahan's data. The fact that, over 5 years, there were nine instances in which an agency run by a manager over 55 was merged into an agency managed by a younger manager, by itself, says nothing without evidence of how many mergers there were over those years and what the ages involved in those mergers were. Moreover, other than his own discharge, Lanahan does not say what happened to the managers whose agencies were merged—were they of-fered other positions, fired, did they take retirement? By itself, this data has no probative value and simply cannot support an inference of discrimination.

■ Finally, Lanahan points to evidence from another age discrimination case against MONY which states that MONY generated projections of the relative costs of maintaining older workers grandfathered under the previous pension plan versus the new plan, and did so prior to discharging Gary Camp, another grandfathered agency manager. *See* Camp Aff. (Complaint Exh. C). Again, if this evidence if probative of anything, it is not of age discrimination but discrimination based on pension status, which is not actionable under the ADEA.

The Court is mindful that the evidence must be looked at in its entirety, rather than piecemeal, in deciding a motion for summary judgment. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997). However, in this case none of Lanahan's evidence has probative value, and the evidence does not gain in inferential power by being lumped together. Lanahan has failed to meet his burden of producing evidence which supports a finding that age played a motivating part in his discharge, and thus summary judgment for MONY is appropriate.

## III. *ERISA Claims*

■ Section 510 of ERISA makes it unlawful for an employer "to discharge, fine suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under [the provisions of an employee benefit plan]." 29 U.S.C. § 1140. To prevail, a plaintiff must show more than that "the loss of pension benefits

---

**5.** Nor does Lanahan's data support a disparate impact claim under the ADEA, because such a claim must allege a disparate impact on the entire class of workers over age 40, a group for which he supplies no data. *See Criley,* 119 F.3d at 105.

**6.** Leone's affidavit recounts at least eleven agency mergers not listed by Lanahan, of which seven involved mergers where the manager of the merged-into agency was the same age or older than the manager of the eliminated agency. The Court is aware of the possibility that MONY's data is as selective as Lanahan's, but it is sufficient to demonstrate the fact that Lanahan's evidence is incomplete and therefore statistically meaningless.

was a mere consequence of ... a termination of employment," *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988) (quoting *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982)), but rather that the employer "was at least in part motivated by the specific intent to engage in activity prohibited by § 510." *Id.*

The analysis of a claim under § 510 proceeds in the same manner as a claim under Title VII or the ADEA—i.e., through the *McDonnell Douglas* burden shifting analysis. *See Dister*, 859 F.2d at 1112–13. One preliminary question needs to be answered, however. In analyzing the ADEA claim above, the Court bypassed the question of whether Lanahan had created a fact issue as to the pretextual nature of MONY's reasons for firing him, because under the Second Circuit's ruling in *Fisher*, a prima facie case coupled with a fact issue on pretext is insufficient to survive summary judgment without a further showing that there is evidence to support a finding of discriminatory motive. Lanahan having made no such showing of discriminatory motive, there was no need to address the question of pretext.

*Dister*, however, specifically held that a prima facie case plus a showing of pretext is sufficient to enable a plaintiff to survive summary judgment. *See id.* at 1113–14. *Dister* was, of course, decided before *Fisher* and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), upon which *Fisher* relied. *Fisher*, however, did not specifically overrule *Dister* and the Second Circuit has not had occasion to apply *Fisher* in the ERISA § 510 context, so there remains the technical question of whether *Dister*'s holding remains good law or was effectively overruled by *Fisher*.

The Court believes that the Second Circuit would apply *Fisher* to § 510 claims as well. To begin with, *Dister* makes clear that, because § 510 claims impose the difficult burden on plaintiffs of proving employer motivation, they are analytically identical to Title VII and ADEA claims. That identity has not changed; only the Second Circuit's interpretation of the *McDonnell Douglas* analysis has. Furthermore, the *Fisher* court made it clear that what it was doing was treating Title VII and ADEA summary judgment motions the same as all other types of cases, *see Fisher*, 114 F.3d at 1346 ("The rule is that there is no rule peculiar to discrimination cases."), and there is simply no reason to think that the Circuit would wish to keep a special rule for § 510 cases. Thus, the Court, as it did for Lanahan's ADEA claim, will not address whether there is a factual issue as to pretext but rather will see if Lanahan has put forward any evidence that supports an inference that illegal motivation played a part in his discharge.

■ The evidence relied upon by Lanahan for the ERISA claim is the same as already recounted for his ADEA claim. To begin with, there are the various statements which Lanahan contends demonstrate a MONY policy of "55 and out." As stated earlier, none of these statements reasonably indicate such a policy. In fact, Mayberry's testimony specifically contradicts any inference of a motivation which is actionable under § 510, because Mayberry made it clear that, far from terminating Lanahan to deprive him of his pension benefits, Mayberry was holding off discharging Lanahan until he was 55 precisely in order to enable Lanahan's benefits to vest.

■ Second, there is Lanahan's statistical data. The attrition data of "grandfathered" employees will not support an inference of illegal motive because the plaintiff nowhere states, or even implies, that the attrition in this group resulted from terminations (constructive or otherwise); rather, he states only that "of those sixteen persons, only [five] are still employed by MONY." Lanahan Aff. ¶ 30. There is thus no data from which a factfinder could conclude that the attrition was attributable to discrimination on the part of MONY as opposed to a myriad of other possible causes, including voluntary retirements.

■ Furthermore, Lanahan's data, even were one to make the unwarranted assumption that all of the attrition he cites resulted from actions on MONY's part, is not probative of discrimination for a more fundamental reason: he offers no data by which a factfinder could determine that MONY treated

grandfathered employees differently from others. That is, even if 11 out of 16 grandfathered agency managers were terminated since 1995, such evidence is probative only if we know that the discharge rate of non-grandfathered managers was significantly less. Such data is meaningless without comparative statistics, and no such statistics of any kind have been presented in opposition to this motion.

 Finally, Lanahan supplies an affidavit from Gary Camp's ERISA suit against MONY, in which Camp states that prior to his termination, he was handed a document prepared by MONY which detailed the cost savings to MONY if Camp did not reach age 55—a savings, Camp states, of approximately $1.9M. *See* Camp Aff. (Complaint Exh. C). While the fact that a plaintiff's discharge saves the employer a significant amount in benefits owed may help bolster an inference of a § 510 violation, by itself that fact alone creates no such inference. Moreover, this data from Camp says nothing about Lanahan's discharge, because Lanahan does not allege that this data was compiled in his case; moreover, Lanahan, unlike Camp, was fired *after* reaching 55, so presumably the pension benefit savings were much less. Finally, to the extent that Lanahan wishes to establish a pattern or practice from Camp's affidavit, this one piece of data is insufficient to create such an inference.

In sum, Lanahan has provided no data from which a reasonable factfinder could infer that his discharge was motivated in part by a desire to deprive him of ERISA benefits. Summary judgment for MONY on Lanahan's ERISA § 510 claim is therefore proper.

IV. *Contract Claim*

 Finally, Lanahan makes a claim for breach of contract. While not pellucidly clear, the thrust of Lanahan's claim is that, in return for paying various operating expenses of his agency (including taking out a loan to finance a Korean client initiative), MONY promised Lanahan certain retirement benefits, including a purported promise that managers who had a combination of age plus years of service totaling eighty would receive subsidized health benefits for life. The claim is, in effect, one to enforce a promise of additional pension and welfare benefits. As defendants correctly point out, such claims have been squarely held to be preempted by ERISA. *See Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 9–10 (2d Cir.1992) (oral promise to provide more lucrative benefit plan preempted by ERISA). Lanahan has not asserted that any of the exceptions to this principle—e.g., that the promised benefits were a one-time severance payment, and thus did not implicate a "plan," *see id.* at 10; *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 7–19, 107 S.Ct. 2211, 2215–21, 96 L.Ed.2d 1 (1987)—apply in his case, nor does it appear from the evidence presented that he could. There being no issue of fact raised as to this preemption defense, summary judgment for the defendant is appropriate.

### CONCLUSION

For the foregoing reasons, the Court grants MONY's motion for summary judgment in its entirety.

**SO ORDERED.**