Kalman WEISS, as assignee, et al., Plaintiffs,

v.

La SUISSE a/k/a La Suisse Lebens–Versicherungs–Gesellschaft, Lausanne, a/k/a La Suisse Life Insurance Company, Lausanne, and Swiss Life a/k/a Swiss Life Insurance and Annuity Company a/k/a Schweinzerische Lebenversicherungsund Rentenanstalt, Defendants.

No. 97 CIV. 1352(CM)(MDF).

United States District Court, S.D. New York.

Sept. 17, 1999.

Richard M. Mahon, Drake, Sommers, Loev, Tarhis & Catania, P.C., New York City, for Plaintiffs.

Richard N. Chassin, Becker, Glynn, Melamed & Muffly, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

McMAHON, District Judge.

In 1989 and 1990, defendant La Suisse Life Insurance Company ("La Suisse"), a Swiss insurance company, acting through various agents, sold a number of life insurance policies to plaintiffs, who are members of the Orthodox and Hasidic Jewish communities resident in Rockland County and New York City. The insureds under the policies, which had a face value of either 50,000 or 100,000 Swiss francs (approximately 32,250 or 64,500 U.S. dollars at the current exchange rate), were all minor children at the time of the purchases. The face amount of the policy was payable to the beneficiary (who was, in most cases, the parent of the insured child) in the event the insured either (1) married or died prior to the end of the contract term, which ran for a term of either fifteen or sixteen years from the date of issue, or (2) survived to the end of the policy term. The economics of the policies were structured so that the annual premiums would more than cover the face value of the policy. The insurer in effect took the risk that the child would either marry or die before the termination of the contract.

The Court is advised that these unusual life insurance policies were quite popular in Switzerland, where people tend to marry later in life, if they marry at all,[1] and the risk of having to make an early payout is quite manageable. However, it appears that the defendant sellers violated an insurer's equivalent of the "know your customer" rule when they permitted the policies to be marketed among plaintiffs and their neighbors. Customs among many Orthodox Jews, particularly within the Hasidic community, are quite different than those in Switzerland. Marriage is the norm, and marriage at an early age (i.e., in the late teens and sometimes younger) is the rule, not the exception. As a result, the policies were a good investment for American Orthodox Jews. Papers before the Court indicate that as many as 7,000 policies were purchased in this State, of which at least half were sold by a Mr. Elias Horowitz of Bituswiss S.A. from his

---

1. According to the Swiss Federal Statistical Office, roughly 40 percent of Swiss adults will remain unmarried. *See* Swiss Federal Statistical Office, Annual Population Statistics (last updated Aug. 12, 1999) <http://www.statistik.admin.ch/stat_ch/ber01/eu0106.htm>.

office in Monroe, New York. The purchasers apparently anticipated that they would work something like burial insurance, except that in most cases, the proceeds would be used to cover the cost of a wedding instead of a funeral. In fact, it is alleged that the agents who peddled them represented that they had been designed especially for the needs of the Orthodox Jewish community. That sales gambit worked, and the policies sold quite well. As a result, the claims began raining down on Lausanne in fairly short order. Therein lies the genesis of this lawsuit.

In July 1997, the Court of Commerce in Zurich (Handelsgericht) held the same La Suisse policy at issue in this case invalid under Swiss law, on the ground that the policy violated Swiss public policy by pressuring young children to marry as early as possible. *See Gutmann v. La Suisse Lebensversicherungs–Gesellschaft*, No. U/O/HG950445 (Jul. 2, 1997). Faced with the voiding of their policies, plaintiffs, members of the Hasidic and Orthodox Jewish communities in New York State, commenced this action here in the United States. They asserted nine claims: breach of contract, common law fraud, civil RICO, violation of 42 U.S.C. § 1981, violation of the New York General Business Law, breach of fiduciary duty, conversion, conspiracy to misappropriate and defraud, and economic duress. Defendants have moved to dismiss on a variety of grounds, both jurisdictional and substantive.

I referred the motion to The Hon. Mark D. Fox, United States Magistrate Judge, who has issued a report and recommendation that the First Cause of Action (for breach of contract) be dismissed with leave to replead, and that the remaining causes of action be dismissed. I agree with the bulk of Judge Fox's conclusions; in particular, I agree with his conclusions that this action cannot be dismissed as against defendant La Suisse, either for lack of personal jurisdiction or under the policy's forum selection clause. I also concur that eight of plaintiffs' nine causes of action should be dismissed, although plaintiffs should have leave to replead one of those claims. I part company with him concerning the First Cause of Action, which states a claim and seems to me to meet the minimal pleading requirements for a breach of contract claim. I also disagree with his conclusion that a sufficient showing has been made to keep La Suisse's parent company, defendant Schweizerische Lebensversicherungsund Rentenanstalt ("Rentenanstalt"), in the case; I conclude that the case should be dismissed for lack of personal jurisdiction over the parent.

I therefore accept so much of the learned Magistrate Judge's recommendation as denied defendants' motions to dismiss for improper venue and lack of personal jurisdiction, and granted their motions to dismiss the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Causes of Action, although I grant leave to replead the Fourth Cause of Action. I do not accept his recommendation that the First Cause of Action be dismissed with leave to replead. I order that the complaint be dismissed as to Rentenanstalt.

### The Forum Selection Clause Does Not Bar Suit in a United States Federal Court

The primary basis for defendants' motion to dismiss is that venue does not lie in this district because each of the policies contained a forum selection clause, which (translated into English from the French and German in which the policies are written) reads as follows:

> The policyholder or the [person having title/beneficiary] have the right to take any dispute between themselves and "La Suisse" either before the judge of the competent court of their domicile in Switzerland or in front of the civil court in Lausanne.[2]

2. Per the terms of the policy, the French and German language versions govern, not any translation into English. The parties have translated the words "l'ayant droit" slightly differently; I place their respective choices in brackets [person having title/beneficiary]. There is no practical difference between the two translations.

Defendants argue that the forum selection clause mandates the litigation of all disputes in Switzerland—and insofar as plaintiffs are concerned, in the civil court in Lausanne, since they have no domicile in Switzerland. Plaintiffs characterize the language of the clause as "ambiguous" and as not foreclosing suit in other fora.

While the result reached by Judge Fox is probably not what defendants intended when they drafted the policy, plaintiffs are correct. Federal courts in this country construe forum selection clauses in accordance with federal law, *see Bense v. Interstate Battery System of America, Inc.,* 683 F.2d 718, 721 (2d Cir. 1982), and under federal law, forum selection clauses are not favored. *See M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 589, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). Thus, clauses like the one before this Court are generally to be construed, if they can be, in ways that will not divest the United States courts of jurisdiction.

The key is whether the language can only be interpreted as providing for a mandatory and exclusive forum, or whether it can be construed as permitting suit in additional fora. In interpreting the relevant language of the contract, U.S. courts have not hesitated to stretch the usual meaning of the words used and have taken every opportunity to construe any possible ambiguity as indicative of permissiveness. For example, in *John Boutari and Son, et al. v. Attiki Importers and Distributors, Inc.,* 22 F.3d 51 (2d Cir.1994), the forum selection clause read, "Any dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts." The language, including its use of the word "shall" (which the Second Circuit acknowledged "is a mandatory term") might seem clear and straightforward in calling for disputes to be resolved in a court in Greece. Nonetheless, the Court of Appeals concluded that the clause was merely permissive, not mandatory; it sidestepped the "mandatory" nature of the word "shall" by concluding, ". . . here it mandates nothing more than that the [Greek courts] have jurisdiction." *Id.* at 53. In explaining the antipathy of American federal courts for international forum selection clauses, the Circuit all but ruled that a forum selection clause would not be enforced unless it contained language on the order of, "All disputes must be brought in a particular forum *and may not be maintained anywhere else.*"

The panel in *Boutari* relied on an earlier opinion by Judge Friendly in *AVC Nederland B.V. v. Atrium Investment Partnership,* 740 F.2d 148, 155 (2d Cir.1984), in which that great jurist, confronted with what appears to be an even less equivocal forum selection clause, declined to enforce its terms literally. The clause read: "All and any disputes, differences or questions arising form the present Agreement shall be decided and determined by the competent court at Utrecht." *Id.* at 151. Certainly, were the identical words used in an arbitration clause in a U.S. commercial contract, no federal court would hesitate for a moment to compel arbitration, which is a favored form of dispute resolution. Nonetheless, Judge Friendly held that the language about litigating in Utrecht was merely permissive and not mandatory:

> The clause was indeed more than a jurisdiction-conferring clause which, although providing a plaintiff with a guaranteed forum, does not deprive him of the right to sue in another having personal jurisdiction over the defendant. *Id.*

*See also Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 979 (2d Cir.1993); *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390, 395–96 (2d Cir.1985).

In light of these holdings—which, as a District Court judge sitting in the Second Circuit, I am bound to follow—I am constrained to conclude that the forum selection clause in the insurance policies sold to plaintiffs does not say what the

defendants who drafted it undoubtedly thought they were saying. As in *Boutari*, the clause is permissive rather than mandatory; it gives the parties "the right to take any dispute between themselves and BLa SuisseH" to a Swiss court of competent jurisdiction, but it does not compel them to do so or preclude them from suing elsewhere. Therefore, as long as there is personal jurisdiction over the defendants in this District, they can be sued here.

### This Court Has Personal Jurisdiction Over the Defendant La Suisse (but not Rentenanstalt)

Except for Rentenanstalt; which is not an a/k/a for La Suisse but rather is its parent company, the challenges to personal jurisdiction are unpersuasive.

■ From the record before the Court, it seems clear that La Suisse's contacts with the Southern District of New York related to the sale of these particular insurance policies more than satisfy the constitutionally mandated "minimum contacts" test of *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Like Magistrate Judge Fox, I credit the evidence showing that La Suisse set up an exclusive agency relationship (though it may not have been exclusive) with Dr. Bernard Rosenberg, a Swiss attorney who is an associate of Horowitz/Bituswiss. Rosenberg and his associates were engaged to sell these policies in New York. As noted above, Horowitz, an associate of Rosenberg's and a Hasidic Jew who lives and works in this District, claims to have sold about half of the 7,000 policies himself, by calling and going to the homes of the members of his community and soliciting their business. A London insurance broker, Moses Krausz, representing Caruso, S.A., which has offices in Liechtenstein, traveled to New York three times for the purpose of explaining coverage, preparing and explaining applications, advising on insurability, and performing similar administrative acts in order to obtain customers for La Suisse. Rosenberg, Horowitz and Krausz all aver that they were acting under the auspices and at the direction of La Suisse. An individual named Josef Rand, whose card identifies him as a resident of Zurich and who held himself out as an agent of La Suisse, met with plaintiffs Pal and Agi Weiss at their home in Brooklyn (which, although not in the Southern District of New York, is within the State of New York) on fifteen separate occasions. There is absolutely no evidence in this record that the activities of these persons here in the United States were unauthorized.

Thus, whether or not La Suisse is generally present in this District, in the sense of having continual and systematic general business contacts, it is hard to escape the conclusion that La Suisse purposefully availed itself of activity within the State of New York and the Southern District of New York in order to peddle the insurance policies that are the subject of this lawsuit.

There are other contacts with New York that satisfy the *International Shoe* test. For example, the policies were delivered here. And although the policies state (in languages that few if any of the plaintiffs spoke) that the premiums are to be paid in Swiss francs in Switzerland, they were in fact paid with American dollars in New York State. Under *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)—a case whose vitality in the context of insurance has not diminished over time, as defendants suggest [3]—that alone meets the constitutional minimum.

■ Besides minimum contacts, the other question to be considered by this Court in assessing the propriety of an exercise of personal jurisdiction is whether

---

3. *See, e.g., Nationwide Mutual Ins. Co. v. Tryg Int'l. Ins. Co., Ltd.*, 91 F.3d 790, 794 (6th Cir.1996); *Olivier v. Merritt Dredging Co., Inc.*, 979 F.2d 827, 833 (11th Cir.1992), *cert. denied sub nom. South Carolina Property and Casualty Ins. Guaranty Ass'n v. Olivier*, 507 U.S. 983, 113 S.Ct. 1577, 123 L.Ed.2d 145 (1993); *Teleco Oilfield Services, Inc. v. Skandia Ins. Co.*, 656 F.Supp. 753, 759 (D.Conn. 1987).

it comports with traditional notions of fair play and substantial justice. Where, as here, the plaintiff has met the minimum contacts test, a finding of reasonableness is favored, unless the defendant presents a compelling case that the presence of other considerations would render jurisdiction unreasonable. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560 (2d Cir.), *cert. denied,* 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). La Suisse has made no such showing on the record before this Court. Rather, given La Suisse's extensive purposeful activity in targeting the New York Hasidic community for the sale of these highly unusual policies, the barriers to obtaining any meaningful relief that the seemingly protective Swiss courts appear to have placed in plaintiffs' way, and the relative means that the two sides have for litigating here as opposed to litigating in Switzerland, there appear to be compelling considerations that render the exercise of personal jurisdiction over La Suisse reasonable.

 With constitutional objections to exercising jurisdiction over La Suisse out of the way, I turn to the issue of service of process. New York's long-arm statute provides that process may be served on defendants outside the State of New York who transact any business within the State or who contract anywhere (including Switzerland) to supply goods or services in the state. N.Y. C.P.L.R. 302(a)(1); *see Caronia v. American Reliable Ins. Co.,* 999 F.Supp. 299, 303 (E.D.N.Y.1998); *Sunrise Industrial Joint Venture v. Ditric Optics, Inc.,* 873 F.Supp. 765, 769–770 (E.D.N.Y. 1995); *Insurance Co. of North America v. Pyramid Ins. Co. of Bermuda Ltd.,* No. 92 Civ. 1816, 1994 Westlaw 88754 at *2–*3, 1994 U.S. Dist. Lexis 2994 (S.D.N.Y. Mar. 16, 1994) (cases cited and discussion therein); *American Centennial Ins. Co. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370(JFK), 1991 Westlaw 60378 at *4–*6, 1991 U.S. Dist. Lexis 4546 (S.D.N.Y. Apr. 8, 1991); *U.N.F. Services, Inc. v. Insurance Co. of North America,* 236 A.D.2d 388, 389, 653 N.Y.S.2d 366, 367 (N.Y.App. Div.1997); *Town of Hempstead v. Certain Underwriters at Lloyd's of London et al.,* 148 A.D.2d 527, 538 N.Y.S.2d 862 (N.Y.App.Div.1989). In addition, New York specifically provides for service of process on insurers who are not authorized to do business in the State but who provide insurance to New Yorkers. N.Y. Ins. L. §§ 1213(b)(1)(A), (C). It is quite clear on this record that the conditions for invocation of that statute have been met as to La Suisse.

The above discussion concerns only La Suisse. The learned Magistrate Judge recommended that I deny Rentenanstalt's motion to dismiss for lack of personal jurisdiction without prejudice, and that the parties be permitted to take discovery concerning the relationship between parent and subsidiary, to see if the ordinary rule that the sins of the subsidiary do not confer jurisdiction over the parent should be suspended in this case.

 At the pre-discovery stage, plaintiffs may defeat a motion to dismiss on jurisdictional grounds by making a prima facie showing of jurisdiction. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116. New York courts may exercise personal jurisdiction over a foreign corporation that is engaged in a continuous and systematic course of "doing business" in the state such that the corporation may be deemed to be "present" in New York. *See Delagi v. Volkswagenwerk A.G.,* 29 N.Y.2d 426, 430–31, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972). To establish personal jurisdiction in a case such as the present one, where plaintiffs claim that the foreign corporation is present in New York on the basis of the activities here of its subsidiary, the subsidiary must be functionally either an "agent" or a "mere department" of the foreign parent. *See Jazini v. Nissan Motor Co.,* 148 F.3d 181, 184 (2d Cir.1998) (citing *Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865 (2d Cir.1996)).

 A subsidiary may be considered an "agent" of its parent if the plaintiff

shows that the subsidiary "does all the business which the [parent corporation] could do were it here by its own officials." *Id.* (quoting *Frummer v. Hilton Hotels Int'l., Inc.,* 20 N.Y.2d 737, 283 N.Y.S.2d 99, 229 N.E.2d 696, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967)). In this case, plaintiffs' complaint asserts simply that Rentenanstalt "holds a beneficial or ownership interest in La Suisse" (Cplt.¶ 12). This ambiguous characterization is plainly insufficient to establish an agency relationship within the meaning of *Jazini.* Nor do plaintiffs' other submissions to this Court suggest a principal-agent relationship between Rentenanstalt and La Suisse.

 Alternatively, plaintiffs may obtain jurisdiction over Rentenanstalt by showing that La Suisse is a "mere department" of its parent. To do so, plaintiffs must establish four elements: common ownership, financial dependency of the subsidiary on the parent, a high degree of interference by the parent in the selection of the subsidiary's executive personnel and disregard of corporate formalities, and a high degree of control over the marketing and operational policies of the subsidiary. *See Volkswagenwerk v. Beech Aircraft Corp.,* 751 F.2d 117, 120–22 (2d Cir.1984). Taking as true the assertion of both plaintiffs and defendants that Rentenanstalt owns 94 percent of the publicly traded shares of La Suisse, the common ownership factor is satisfied. Plaintiffs attempt to satisfy the remaining factors by pointing out, in their objections to Judge Fox's Report, that the Chairman of La Suisse's Board also sits on Rentenanstalt's Supervisory Board and is a member of La Suisse's

Steering Committee; that the Vice–Chairman of La Suisse's Board is also the President of the Group Management of Rentenanstalt, and likewise serves on La Suisse's Steering Committee; and that the Chief Financial Officer of Rentenanstalt serves on La Suisse's Board. However, the overlap of directors and officers between parent and subsidiary alone does not render the subsidiary a "mere department" for jurisdictional purposes. *See Jazini,* 148 F.3d at 185 (citing *Porter v. LSB Indus.,* 192 A.D.2d 205, 600 N.Y.S.2d 867, 873 (1993)). What plaintiffs need—and have failed—to demonstrate is a total "disregard for the separate corporate existence of the subsidiary." *Beech Aircraft,* 751 F.2d at 120.

 Plaintiffs further attempt to establish the "mere department" status of La Suisse through the declaration of Moses Krausz. Mr. Krausz is a former employee of Caruso, S.A., a firm that sold policies similar to those at issue here to the Orthodox Jewish community in New York as an agent for La Suisse. Specifically, Mr. Krausz asserts that Rentenanstalt is "clearly and actively involved in the negotiations between La Suisse and its policyholders and agents" based on correspondence regarding a meeting between attorneys for aggrieved La Suisse policyholders and officers of Rentenanstalt (Krausz Decl. at 3). According to Mr. Krausz, the meeting took place at Rentenanstalt's corporate headquarters without the participation of any representatives from La Suisse. Again, this isolated and vaguely described interaction falls far short of the "complete domination" necessary to secure jurisdiction over a corporate parent.[4] *See Morris v. New York State*

---

4. Mr. Krausz also claims that he was told by an unspecified individual or individuals at La Suisse that La Suisse "could make no major decision without the consent of Rentenanstalt" (Krausz Decl. at 4). Although his declaration provides no further information about what might constitute the types of "major decisions" over which Rentenanstalt retains control, the courts have long acknowledged that the inherent supervisory role held by parents over subsidiaries is not enough to

subject parents to jurisdiction. *See, e.g., Beech Aircraft,* 751 F.2d at 120 (noting that a parent "necessarily exercise[s] a considerable degree of control over the subsidiary" and that "the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction"); *Saraceno v. S.C. Johnson and Son, Inc.,* 83 F.R.D. 65, 71 (S.D.N.Y. 1979) (finding that the power to make "broad policy decisions" is "inherent in the parent-subsidiary relationship and does not justify

*Dep't of Taxation and Finance,* 82 N.Y.2d 135, 142, 603 N.Y.S.2d 807, 811, 623 N.E.2d 1157 (1993). *Compare, e.g., Beech Aircraft,* 751 F.2d at 120–22 (jurisdiction over parent established where subsidiary was wholly owned by parent, parent provided subsidiary with 71 percent of its debt, subsidiary did not hold directors meetings, parent controlled inventory levels, accounting systems, insurance, and advertising, and prohibited subsidiary from changing ownership or management without parent's approval). In light of plaintiffs' failure to make even a minimal showing of any basis for personal jurisdiction over La Suisse's parent, further discovery is unwarranted, and the complaint is dismissed as to Rentenanstalt.

### All But the First Cause of Action Should be Dismissed on the Merits

Of course, the fact that this Court has jurisdiction over La Suisse does not mean that plaintiffs have adequately pleaded claims entitling them to relief. Magistrate Judge Fox recommends that eight of plaintiff's nine claims for relief—the Second through Ninth Causes of Action—be dismissed. I concur.

▮▮▮▮ The Second Cause of Action pleads a claim in common law fraud. This claim could be dismissed under Fed. R.Civ.P. 9(b), since it is inadequately pleaded in almost every respect—the allegations are not specific as to the time, place and content of the alleged misrepresentations and most of the allegations are made on information and belief. However, to avoid unnecessary repleading, I am dismissing it on the ground that it fails to state a cause of action. A false promise can support a claim of fraud only where it was collateral or extraneous to the terms of the enforceable agreement in place between the parties. *International Cabletel Inc. v. Le Groupe Videotron Ltee.,* 978 F.Supp. 483, 487 (S.D.N.Y.1997). Here, plaintiffs do not specify what representation(s) were made, by and to whom, in order to induce each of them to purchase a

labeling a subsidiary a 'mere department' of

policy. Nonetheless, it seems quite clear that they have not alleged the making of any false promise that was collateral or extraneous to the insurance contract. To the contrary, viewing the allegations of the complaint most favorably to plaintiffs, they assert only that defendants made various false statements and representations that were contrary to their actual intent with respect to the performance of their contract obligations (Cplt.¶ 160). This sort of general allegation that a defendant entered into a contract lacking the intent to perform is insufficient to support a claim of fraud. So are allegations that the insurer was engaged in a scheme to receive premiums without giving any benefits in return. "Where a complaint does not state the specific promises or omissions of material facts allegedly made by the insurer, it alleges nothing more than a breach of the contract and any covenants implied; it does not allege a cause of action for fraud in the inducement." *New York University v. Continental Ins. Co.,* 87 N.Y.2d 308, 318–19, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995). I agree with Judge Fox that this is not a curable pleading defect, but a fundamental flaw in plaintiff's theory of recovery. Therefore, the motion to dismiss the Second Cause of Action is granted.

▮▮▮▮ The Third Cause of Action is brought under the Racketeering and Corrupt Influences Act (RICO), 18 U.S.C. § 1961 *et seq.* Plaintiffs allege, in substance (not to mention on information and belief), that defendants maintained a pattern of racketeering activity through mail fraud, wire fraud and conspiracy to violate the rights of United States citizens and to deceive and defraud plaintiffs in the purchase and placement of life insurance policies. Whether this was intended to state a claim under 18 U.S.C. § 1962(c) or some other section of the RICO statute is, in the end, irrelevant. For under any substantive RICO count, a plaintiff must allege that the defendant, through a pattern of racke-

the parent"). ·

teering activity, directly or indirectly invests in or maintains an interest in an enterprise. The law is quite clear that the RICO person (i.e., the defendant) cannot also be the RICO enterprise. *See Riverwoods Chappaqua Corp. v. Marine Midland Bank,* 30 F.3d 339, 344 (2d Cir.1994); *Discon, Inc.v. NYNEX Corp.,* 93 F.3d 1055, 1063–64 (2d Cir.1996), *cert. denied,* — U.S. ——, 118 S.Ct. 49, 139 L.Ed.2d 14 (1997). In this complaint, La Suisse and Rentenanstalt are both the RICO persons and the RICO enterprise (Cplt.¶¶ 169, 172). Accordingly, the civil RICO claim is dismissed.

The Fourth Cause of Action alleges that defendants discriminated against plaintiffs based upon their racial and ethnic identity by refusing to pay benefits due under the terms and conditions of the insurance policies, in violation of 42 U.S.C. § 1981, which provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. § 1981(a).

■ This claim is also fatally flawed, in that defendants have not alleged circumstances or events from which racial animosity can fairly be inferred. To establish a claim under § 1981, a plaintiff must allege sufficient facts to support the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race, and (3) the discrimination concerned one or more of the activities enumerated in the statute (in this case the making and enforcing of contracts). *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). As Jews, plaintiffs satisfy the first factor. *See Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 618, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987) (recognizing individuals of Jewish ancestry as a distinct race under § 1981).

■ To satisfy the second element, a plaintiff must "specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar College,* 35 F.3d 709, 713 (2nd Cir. 1994). Here, plaintiffs have alleged only that defendants "discriminated against plaintiffs based upon their ethnic and racial identity" by refusing to pay benefits and interest due or make loans under the policies, intentionally procuring lapses under the policies, failing to accept payment or recognize policy reinstatement provisions as to plaintiffs, and failing to adequately compensate plaintiffs for defendants' failure to comply with the terms of the policy (Cplt.¶ 191). The complaint neglects to identify any circumstances or events, apart from plaintiffs' bare allegation, that would, directly or indirectly, link the alleged breaches of contract to plaintiffs' racial identity, and, as such, is "too conclusory to survive a motion to dismiss." *Albert v. Carovano,* 851 F.2d 561, 572 (2nd Cir.1988). *See also Harary v. Allstate Ins. Co.,* 983 F.Supp. 95, 99–100 (E.D.N.Y. 1997) (dismissing as conclusory mere allegation that insurance claim was denied solely by reason of Israeli ancestry). *Compare, e.g., Williams v. Greendolf, Inc.,* 735 F.Supp. 137, 139–40 (S.D.N.Y.1990) (finding that inference of racial animus could be drawn from § 1981 plaintiff's allegation that employer told him employment would be permanent but after discovering that plaintiff was African–American hired plaintiff only on temporary basis and replaced him).

■ However, plaintiffs should be permitted to amend their complaint in order to specify the requisite circumstances and events of racial animosity. In the Second Circuit, civil rights complaints are to be construed liberally. *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,*

507 U.S. 163, 168, 113 S.Ct. 1160, 1162–63, 122 L.Ed.2d 517 (1993)). A court should not grant a motion to dismiss "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991). In the present case, Judge Fox's Report appears to recommend dismissal with prejudice of plaintiffs' § 1981 claim, on the rationale that because plaintiffs' witnesses testified that the policies at issue were created and marketed specifically for Orthodox and Hasidic Jewish persons, it would be logically inconsistent to allow plaintiffs to argue that coverage was denied out of racial animus. This conclusion is not self-evident. That the policies were developed for a specific racial group does not inexorably rule out the presence of discriminatory intent in La Suisse's denial of benefits and reinstatement. Therefore, viewing plaintiffs' complaint under the permissive standard of *Mian*, plaintiffs may yet be able to specify circumstances and events necessary to state a viable § 1981 claim, and should be afforded the opportunity to do so.[5]

■ The Fifth Cause of Action alleges that defendants violated § 349 of the New York General Business Law. That statute prohibits the use of deceptive practices with respect to consumer products that have a broad impact on consumers at large. The New York Court of Appeals recently ruled that an insurance contract that involved sophisticated parties did not fall within the ambit of the General Business Law. *See New York University v.*

*Continental Ins. Co.*, 87 N.Y.2d 308, 321, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995). Magistrate Judge Fox concluded that these insurance contracts fell within the *New York University* exception to § 349, because the essence of plaintiffs' allegations—that defendants failed to pay the benefits due under their insurance policies—is not a deceptive practice that has a broad impact on consumers at large. I agree with the learned Magistrate Judge. As Judge Mukasey recently ruled in a similar case, *Allahabi v. New York Life Ins. Co.*, No. 98 Civ. 4334(MBM), 1999 Westlaw 126442 at *2 (S.D.N.Y., Mar.10, 1999), "Although such conflicts [i.e., non-payment of benefits] are the sort that could potentially arise between any insured and insurer, the specific allegations at issue here are 'unique to the parties' and do not have any 'broader impact on consumers at large.'" It is hard to imagine a set of circumstances where the dispute is more "unique to the parties" than this one, which has its genesis in the cultural differences between the plaintiffs—a self-admitted separate community that endeavors to stand apart from society generally—and an alien insurer that apparently knew little or nothing of their special lifestyle. The motion to dismiss is granted.

■ The Sixth Cause of Action, as Judge Fox observed, merely shoehorns plaintiffs' complaints about breach of contract into a new shoe: breach of fiduciary responsibility. As plaintiffs do not allege a single fact from which a trier of fact could conclude that their relationship with defendants or their agents was imbued with

**5.** Defendants cite *Dickerson v. State Farm Fire & Casualty*, No. 95 Civ. 10733(MBM), 1996 WL 445076 (S.D.N.Y. Aug.1, 1996) for the proposition that a § 1981 plaintiff should be denied leave to replead where the complaint is devoid of circumstances and events pointing to racial animus. However, in that case, plaintiffs sought to delay a determination of defendant's Rule 12(b)(6) motion until the completion of discovery. As the *Dickerson* Court noted, the purpose of discovery "is to find out additional facts about a well-pleaded claim, not to find out whether such a claim

exists." *Id.* at *4. In this case, by contrast, plaintiffs have represented to the Court that they are at present "prepared to detail the circumstances or events from which racial animosity may be inferred" (Plaintiffs' Objections to R & R at 5). While it seems more likely that La Suisse was motivated by the prospect of financial catastrophe arising from so many early marriages than by the ethnic background of the early-to-wed, it is not impossible that plaintiffs can cure the defect in their pleading.

elements of "trust and confidence," so as to render it more than an arm's length business association, their claim cannot stand. This was a business transaction, nothing more; caveat emptor, not trust and confidence, was the rule of the day. *See Dornberger v. Metropolitan Life Ins. Co.,* 961 F.Supp. 506, 546 (S.D.N.Y.1997). The Sixth Cause of Action is dismissed.

■ The Seventh Cause of Action is labeled conversion. However, it is well settled that a breach of contract cannot also be a tort. Defendants cannot convert what plaintiffs claim under a contract. This claim is dismissed.

■ The Eighth Cause of Action alleges more of the same. It is denominated Conspiracy to Misappropriate and Defraud. Magistrate Judge Fox characterizes the claim as follows: "In this context La Suisse and Rentenanstalt have conspired essentially to give plaintiff, the policyholders, a hard time" (R & R at 28). In other words, defendants are alleged to have breached their contract with their insureds. Plaintiffs are reminded that there is no tort of conspiracy in New York; rather, conspiracy may be alleged only to connect someone to an otherwise actionable tort committed by another. *See Ferguson v. Meridian Distribution Services, Inc.,* 155 A.D.2d 642, 548 N.Y.S.2d 233 (N.Y.App.Div.1989). Plaintiffs claim that La Suisse and its parent have actually breached their contractual relationship with their insureds. They have no separate claim that the same parties have conspired to do what they did. This cause of action, too, is dismissed.

■ Finally, we come to the Ninth Cause of Action, which is labeled Economic Duress. In it, plaintiffs contend that defendants' efforts to compromise the claims that underlie this action were of a threatening nature and that they constituted duress—duress to which the plaintiffs apparently did not succumb. Of course, there is no such cause of action; duress is a defense, and one that can be asserted only in the most extreme circumstances. Here, the settlement talks failed and plaintiffs

sued. They were not coerced into doing anything at all. Judge Fox conjectures, and I agree, that plaintiffs are here trying to invent some sort of claim that will entitle them to punitive damages, which are not recoverable for breach of contract. *See Rocanova v. Equitable Life Assurance Society of U.S.,* 83 N.Y.2d 603, 612 N.Y.S.2d 339, 342, 634 N.E.2d 940, 943 (1994). Their effort fails. The Ninth Cause of Action is dismissed.

This leaves the First Cause of Action, which is the real gravamen of this case: plaintiffs' claim for breach of contract due to defendants' failure to honor their demands for payment under the policies. Magistrate Judge Fox correctly observes that this claim as pleaded would not be used by a professor of civil procedure in a first year law school class to teach her students the art of pleading. His recommendation is that the claim be dismissed, but with leave to replead. I conclude that repleading is not necessary; and since the First Cause of Action unquestionably states a claim for relief, I deny the motion to dismiss it.

The long and the short of Judge Fox's reasoning appears to be that plaintiffs did not specifically particularize which of La Suisse's bad acts (as pleaded in Cplt. ¶ 26) were directed toward each individual plaintiff. But this is not a fraud claim, and there is no requirement in the Federal Rules of Civil Procedure that the details of a breach of contract claim be pleaded with particularity. Instead, the short, plain notice rule of Fed.R.Civ.P. 8 applies. What defendants ask the Court to require is a complaint that substitutes for a bill of particulars. When fraud is alleged, that level of detail is required. When breach of contract is alleged, it is not.

■ As to each plaintiff, the complaint pleads the existence of the policy, the payment of requisite premiums, the satisfaction of the condition precedent to payment as stated on the face of the policy, and the failure and refusal to pay despite demands having been made. In the

specific cases of plaintiffs Weinstock, Rubin, Engel, Askenazi, Hillman, Hirsch, Wieder, Kaufman, Rubin, Epstein, and Lunger, it pleads the existence of the policy and payment of premiums and failure to reinstate the policy after failing to give notice of lapse or having wrongfully induced a lapse. This is more than adequate to survive a motion to dismiss. The motion is denied.

The Court extends its deepest gratitude to Judge Fox and his staff for their hard work on the extremely lengthy record presented by the parties.

### Future Proceedings

It has been represented, both to me and to Magistrate Judge Fox, that the policies were eventually paid. Judge Fox warned plaintiffs that they would be bound by that representation, and they made it anyway, so presumably it is true. That leaves the Court with only a claim for interest due to the allegedly late payment—the detritus of the sole remaining cause of action, for breach of contract—and a possible claim of racial discrimination as to which there are obvious defenses.

Following service of an amended complaint, the matter is referred back to Judge Fox, to see if he can broker a settlement. If not, I will discuss with the parties the possibility of trying this case on stipulated facts. The issues that remain are few in number and narrow in scope. There is no longer a lot of money at stake. It makes little sense to move forward on all cylinders.

This constitutes the decision and order of the Court.