563 S.E.2d 352

**BUILDER MART OF AMERICA, INC., Builder Mart of Albemarle, Inc. and William T. Huckabee, III, Appellants,**

v.

**FIRST UNION CORPORATION, Respondent.**

No. 3484.

Court of Appeals of South Carolina.

Submitted Oct. 1, 2001.
Decided April 29, 2002.

502

William A. Jordan and B. Allen Clardy, Jr., both of Jordan & Clardy, of Greenville, for appellants.

H. Sam Mabry, III, and J. Derrick Quattlebaum, both of Haynsworth, Sinkler & Boyd, of Greenville, for respondent.

STILWELL, Judge:

Builder Mart of America (BMA), Builder Mart of Albemarle (Albemarle), and William Huckabee (collectively Appellants) brought this action against First Union Corporation (First Union) alleging multiple causes of action arising from a loan transaction. An order of default was entered against First Union. Upon receiving notice of a damages hearing, First Union moved to set aside the default and to dismiss the action based on lack of personal and subject matter jurisdiction. The trial court held that it lacked both, vacated the default judgment, and dismissed the action. We affirm.[1]

## FACTS/PROCEDURAL BACKGROUND

BMA is a South Carolina corporation with its principal place of business in Greenville. Albemarle, a franchisee of BMA, is a North Carolina corporation owned by Huckabee with its principal place of business in Stanley, North Carolina. First Union is a bank holding company organized under the laws of North Carolina with its principal and only place of business in Charlotte, North Carolina, and owns 100% of the stock of First Union National Bank of North Carolina (FUNB(NC)).

FUNB(NC) loaned Albemarle $500,000 pursuant to a secured promissory note. The note specifically identified the lender as FUNB(NC), and the funds advanced were transferred to either Albemarle or Huckabee in North Carolina. The collateral which secured the obligation was located in its entirety in North Carolina, and the security interests in the collateral were filed and perfected in North Carolina. The note provided that the terms of the agreement would be governed by and construed in accordance with North Carolina law.

Albemarle was indebted to BMA and, as part of the loan transaction, BMA agreed to subordinate its rights to collateral in favor of FUNB(NC). This subordination agreement was memorialized in a letter from BMA's president, Brian MacKenzie, to John Robertson, vice president of FUNB(NC). The letter provided in part as follows:

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

BMA agrees to use its best efforts to assist [FUNB(NC)] to maximize the liquidation value of inventory and accounts receivable at [Albemarle] in the event default occurs on the [FUNB(NC)] note .... [FUNB(NC)] agrees to notify BMA in advance of its intentions to exercise its options in the event of a default by [Albemarle] with respect to the [FUNB(NC)] loans.

Albemarle defaulted on the note, and FUNB(NC) called the loan. MacKenzie advised Robertson that BMA had become aware of FUNB(NC)'s intent to call the loan and referred to the subordination agreement. MacKenzie stated, "we stand ready to assist you in the disposition of inventory assets at [Albemarle] so that both BMA and [FUNB(NC)] can recover the funds advanced." FUNB(NC)'s legal counsel informed MacKenzie that Albemarle was in default and FUNB(NC) had requested Albemarle to peacefully surrender collateral, but Albermarle had failed to do so. Counsel further advised BMA that FUNB(NC) intended to institute legal proceedings against Albemarle unless the loan was satisfied in full. FUNB(NC) subsequently filed an action against Albemarle and Huckabee. The parties entered into a liquidation agreement which provided that an auctioneer would conduct a going-out-of-business sale at Albemarle and the remaining uncollected accounts receivable would be sold at public sale in North Carolina. After liquidating the collateral, FUNB(NC) filed an action against Albemarle and Huckabee for the deficiency. The parties eventually settled, and FUNB(NC) filed a voluntary dismissal with prejudice. Appellants then commenced this action against First Union Corporation.

## LAW/ANALYSIS

### A. *Specific Personal Jurisdiction*

### 1. Registration in South Carolina

■ First Union is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. First Union does not own any property, have any employees or agents, loan money, provide checking accounts, borrow money or transact banking activities in South Carolina. Appellants argue that South Carolina can validly exercise personal jurisdiction because First Union is registered as a bank holding

corporation with the South Carolina Board of Financial Institutions and has designated an agent for service of process. We find no merit in this argument.

"A corporation can be qualified to do business in South Carolina and have appointed an agent for service of process but still not be conducting sufficient activities in South Carolina to be subject to suit here." S.C.Code Ann. § 33–15–101, Reporter's Comments § 2 (Rev.1990). "We think the application to do business and the appointment of an agent for service to fulfill a state law requirement is of no special weight.... Applying for the privilege of doing business is one thing, but the actual exercise of that privilege is quite another." *Ratliff v. Cooper Labs., Inc.,* 444 F.2d 745, 748 (4th Cir.1971) (citation omitted). *See also White v. Stephens,* 300 S.C. 241, 387 S.E.2d 260 (1990) (Power of attorney executed and recorded in South Carolina was insufficient to support jurisdiction where the power was never exercised in this State.).

### 2. First Union's Involvement in the Loan

■ Appellants contend First Union was involved in the negotiations resulting in the subordination agreement between FUNB(NC) and BMA, which they allege was breached. We disagree.

South Carolina's long-arm statute confers jurisdiction on state courts over "persons," including corporations, "who act[] directly or by an agent as to a cause of action arising from the person's (a) transacting any business in this State; ... or (g) [entering] into a contract to be performed in whole or in part by either party in this State...." S.C.Code Ann. § 36–1–201(28), (30) (1976); S.C.Code Ann. § 36–2–803(1)(a),(g) (1976). Since South Carolina's long-arm statute extends to the full reach of jurisdiction permitted by the Due Process Clause, we limit our inquiry to the issue of whether due process has been satisfied. *Atlantic Soft Drink Co. v. S.C. Nat'l Bank,* 287 S.C. 228, 231, 336 S.E.2d 876, 878 (1985).

■ Personal jurisdiction under the long-arm statute is subject to a two-step analysis: (1) the power prong and (2) the fairness prong. *Southern Plastics Co. v. Southern Commerce Bank,* 310 S.C. 256, 423 S.E.2d 128 (1992); *Aviation Assocs. &*

*Consultants, Inc. v. Jet Time, Inc.,* 303 S.C. 502, 402 S.E.2d 177 (1991). The court must determine whether the defendant's minimum contacts with the forum state are sufficient to satisfy due process in applying the long-arm statute. The focus must center on the contacts generated by the defendant, not the unilateral actions or letters of the complaining party. *Aviation Assocs.* at 507–08, 402 S.E.2d at 180. The contacts must be sufficient that the defendant would reasonably anticipate being haled into court or has purposefully availed itself of activities within the forum state. *Id.*

The subordination agreement was negotiated between FUNB(NC) and BMA, as evidenced in the letter addressed to the vice president of FUNB(NC) in Albemarle which stated BMA would assist FUNB(NC) in the liquidation in the event of default. FUNB(NC)'s senior vice president who handled the liquidation, the vice president of FUNB(NC)'s Albemarle branch, a FUNB(NC) employee in the special assets division who handled the Albemarle account, and the account manager involved in the transaction all provided affidavits stating they had no authority to enter into contracts on behalf of First Union. The FUNB(NC) employees also stated FUNB(NC) is a separate legal entity from First Union, and First Union was not involved in the transactions with Appellants. We agree with the trial court that any alleged breach of the subordination agreement resulted from FUNB(NC)'s actions rather than First Union's. There is no evidence First Union had any involvement with the transactions, and the individuals involved were not acting as its employees or agents.

Even assuming for the sake of argument that the courts of South Carolina could exercise jurisdiction over FUNB(NC) because of its actions, that fact alone would not be sufficient to extend jurisdiction over First Union. Although FUNB(NC) is a subsidiary of First Union, the companies are separate legal entities operating under separate boards of directors with separate employees, assets, and places of business. " 'As a general rule, a parent or holding corporation is not liable on the contracts of its subsidiary. The mere fact of the ownership of a majority of all the stock of its subsidiary does not render the parent corporation liable on the contracts of the subsidiary.' " *Carroll v. Smith–Henry, Inc.,* 281 S.C. 104, 105–106, 313 S.E.2d 649, 650 (Ct.App.1984) (quoting jury

charge taken from 19 Am.Jur.2d *Corporations* § 716 (1965)). Furthermore, "[t]he mere acquisition and control of a domestic subsidiary's capital stock does not subject the foreign parent to the jurisdiction of that State's courts." *Yarborough & Co. v. Schoolfield Furniture Indus., Inc.,* 275 S.C. 151, 153, 268 S.E.2d 42, 44 (1980).

### 3. Contract Requiring Performance in South Carolina

■ Appellants argue First Union's involvement confers personal jurisdiction because the subordination agreement was a contract made in and requiring performance in South Carolina. Appellants argue that BMA's offer to assist FUNB(NC) with liquidation of the collateral would necessitate performance of the contract in South Carolina at their outlets. However, the loan documents make no mention of any specific method or manner of disposition of the collateral. BMA asserts that its unilateral letter to FUNB(NC) necessarily implies that the contract required performance in South Carolina. Such an inference is not supported by the complaint or any other evidence in the record. Thus, inferring performance of the liquidation of collateral under the contract in South Carolina "would require this court to engage in impermissible speculation." *Internat'l Mariculture Res. v. Grant,* 336 S.C. 434, 438, 520 S.E.2d 160, 162 (Ct.App.1999) (citing *Yarborough* at 153, 268 S.E.2d at 43 ("When jurisdiction is challenged, the plaintiff has the burden of presenting facts sufficient to support jurisdiction.")). Although the letter and supporting affidavits clearly set forth BMA's understanding, they are silent as to FUNB(NC)'s understanding or intentions. Unilateral contacts or assertions are insufficient to confer jurisdiction. *Aviation Assocs.* at 507–08, 402 S.E.2d at 180.

### 4. Crutchfield Letter

■ Appellants also point to a letter from the president of First Union, Ed Crutchfield, to Huckabee expressing concern and thereby demonstrating some minimal knowledge of and involvement with the Albemarle loan. "Although a single act may support jurisdiction, it must create a 'substantial connection' with the forum." *Aviation Assocs.* at 508, 402 S.E.2d at 180 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105

S.Ct. 2174, 85 L.Ed.2d 528 (1985)). BMA's reliance on a letter from the president of First Union to a resident of North Carolina who is the owner of a North Carolina corporation to somehow vest a South Carolina court with jurisdiction in this case is unavailing. We are unable to discern any reason why this letter provides any nexus to the State of South Carolina, much less the substantial connection necessary for this state to exercise personal jurisdiction. Like BMA's letter to FUNB(NC), Crutchfield's letter to Huckabee is insufficient to establish contacts sufficient to vest South Carolina courts with jurisdiction and comport with due process.

### 5. Fairness Prong and North Carolina's Interest

In addition, the fairness prong dictates that South Carolina not exercise personal jurisdiction in this instance. Under the fairness prong, we examine such factors as the burden on the defendant, the extent of the plaintiff's interest, South Carolina's interest, efficiency of adjudication, and the several states' interest in substantive social policies. *See Southern Plastics* at 263, 423 S.E.2d at 132. The loan was executed and performed in North Carolina and provides that North Carolina law controls any disputes arising from it. While choice of law analysis is separate and distinct from personal jurisdiction analysis, which state's law controls is a factor to be considered under the fairness prong of due process. *Burger King v. Rudzewicz,* 471 U.S. 462, 481–82, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985). Since the dismissal of this case, plaintiffs have proceeded with an identical lawsuit in North Carolina, naming both First Union and FUNB(NC) as parties. Efficiency argues against parallel lawsuits.

North Carolina is clearly the more appropriate forum for resolution of this dispute. While the existence of another forum will not always preclude our exercise of jurisdiction, to do so in this case would contravene the limited jurisdiction exercised by each state's courts and impinge on the sovereignty of our sister state. While primarily viewed as a due process concept, "[t]he concept of minimum contacts ... [also] acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–92, 100 S.Ct.

559, 564, 62 L.Ed.2d 490 (1980). Under principles of interstate federalism,

> the Framers also intended that the States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment.

*Id.* at 293, 100 S.Ct. at 565. The courts of South Carolina must comply with the constitutional limits of due process, which in this case requires us to deny personal jurisdiction based on our long-arm statute. Therefore, we decline to exercise specific personal jurisdiction on these facts.

## B. *General Personal Jurisdiction*

 Appellants finally argue that South Carolina has general personal jurisdiction over First Union through the activities, unrelated to the loan in this case, of its wholly owned subsidiary, First Union National Bank of South Carolina (FUNB(SC)). Appellants contend that South Carolina should exercise jurisdiction based on First Union's unified marketing and advertising strategy and its holding itself out to the general public as a single entity, rather than separate subsidiary corporations. Because the activities of FUNB(SC) are unrelated to this loan transaction, we hold that South Carolina cannot exercise general personal jurisdiction over First Union based on the mere presence in this state of a wholly owned subsidiary and unified advertising strategy.

Courts in a few earlier decisions refused to allow corporations to escape jurisdiction by flawless corporate structuring on paper where the corporation in reality holds itself out to the public as a unified public entity. *See, e.g. FDIC v. British–Am. Corp.*, 726 F.Supp. 622, 629–30 (E.D.N.C.1989) ("[A] parent corporation is not doing business in a state merely because of the presence of its wholly owned subsidiary...." However, a parent cannot "hide behind the fiction of a subsidiary and enjoy the benefits of a forum while at the same time avoiding the responsibilities attendant therewith." It would be a "travesty" to allow the parent to hold itself out to the public and shareholders as doing business yet "selec-

tively avoid process from [the state's] courts at its whim."). However, such decisions are anomalous in light of the due process constraints placed on the exercise of personal jurisdiction by the United States Supreme Court's "minimum contacts" cases flowing from the *International Shoe* progeny, such as *Asahi, Burger King, Helicopteros,* and *World–Wide Volkswagen. Internat'l Shoe Co. v. Wash.,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Asahi Metal Indus. Co. v. Super. Ct. of Cal.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

A large majority of courts in more recent cases have uniformly declined to extend jurisdiction to the parent based *solely* on the activities of a subsidiary where those activities are *unrelated to the cause of action* and do not bear a substantial connection to the case at hand. "The presence of the subsidiary alone does not establish the parent's presence in the state." *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 184 (2d Cir.1998). For the courts to have personal jurisdiction, Appellant must show that the subsidiary functions as the agent or mere department of the parent—that is, that the subsidiary does all the business which the parent corporation could do if here on its own. *Id.* at 184. Moreover, "*the agency rule ordinarily does not apply to a holding company* inasmuch as the parent could simply use another subsidiary to accomplish the same result."

In making this determination, the courts look at four factors: (1) common ownership, (2) financial independence, (3) degree of selection of executive personnel and failure to observe corporate formalities, *and* (4) the degree of control over marketing and operational policies. *Jazini* at 185. It is essential that *all four factors be present with sufficient factual specificity* to confer jurisdiction on state courts. *Id.; accord Weiss v. La Suisse,* 69 F.Supp.2d 449, 458 (S.D.N.Y.1999) ("vaguely described interaction" fell far short of prima facie showing of four factors beyond mere common ownership and overlap in directors needed to survive motion to dismiss). Here, Appellants have not provided proof of any of the factors

beyond mere allegations, much less proof of all four to the requisite degree of specificity. "[W]e are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986). While the test for exercising general personal jurisdiction over a foreign corporation is a stringent one, it

> is the consequence of the problems inherent in attempting to sue a foreign corporation that has carefully structured its business so as to separate itself from the operation of its wholly-owned subsidiaries ...—as it may properly do. The rules governing establishment of jurisdiction over such a foreign corporation are clear and settled, and it would be inappropriate for us to deviate from them or to create an exception to them because of the problems plaintiffs may have in meeting their somewhat strict standards.

*Jazini* at 185. Likewise, the third circuit declined to extend liability or jurisdiction to the parent based on agreements entered by its subsidiary. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187 (3d Cir.2001). Applying general agency principles, the court held appellant must demonstrate both that the subsidiary was acting for the parent as its agent and that the cause of action arose out of or relates to the cause of action alleged in the complaint. *Id.* at 198–99.

As the United States Supreme Court has explained, "when the *'minimum contact'* that is a substitute for physical presence consists of property ownership it *must, like other minimum contacts, be related to the litigation.*" *Burnham v.Super. Ct. of Cal.,* 495 U.S. 604, 620, 110 S.Ct. 2105, 2115, 109 L.Ed.2d 631 (1990) (emphasis added). The court refused to extend jurisdiction based on general agency principles to unrelated causes of action. *Accord Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 856–57 (5th Cir.2000) (Appellant had not made a prima facie showing that holding company exercised such undue control that subsidiary was alter ego of parent, as required for attributing continuous and systematic contacts based on general jurisdiction.).

Thus, while the weight of authority is somewhat split, the few courts that have addressed the issue have found unified marketing and advertising and holding out to the public as a

single entity, *without more*, insufficient to confer jurisdiction. *See Newman v. Comprehensive Care Corp.*, 794 F.Supp. 1513, 1519 (D.Or.1992) (Court did not have general jurisdiction where plaintiffs did not show substantial or continuous and systematic contacts. Activities of the parent were irrelevant to jurisdiction absent indication that formal separation was not scrupulously maintained. Despite overlapping directors and isolated commercial loans, contacts unrelated to cause of action were irregular, and national advertising was insufficient to confer general jurisdiction.). Here, the complaint in no way alleges that the activities of FUNB(SC) are related to the underlying loan transaction, and thus our fact-specific inquiry abruptly ends.

The record before us is devoid of annual reports, brochures, or evidence to establish that First Union exercises a unified marketing and advertising strategy. Typically, the burden is on the appellant to provide an adequate record to support its claims. Rule 210(h), SCACR ("[T]he appellate court will not consider any fact which does not appear in the Record on Appeal."); *see, e.g. Crestwood Golf Club, Inc. v. Potter*, 328 S.C. 201, 215, 493 S.E.2d 826, 834 (1997) (Appellant has the burden of providing court with sufficient record on which to make a decision.); *Hill v. Dotts*, 345 S.C. 304, 309, 547 S.E.2d 894, 897 (Ct.App.2001). However, even assuming without deciding that we may take judicial notice of First Union's annual reports, television advertisements, and signposts that simply say "First Union" in South Carolina, these without more are insufficient reason to exercise jurisdiction because any South Carolina presence through the activities of FUNB(SC) is unrelated to the present litigation, and because Appellants have failed to carry their prima facie burden of proof of establishing an agency relationship between the parent and subsidiary sufficient under the minimum contacts analysis. In short, the presence of FUNB(SC) in this state does not provide even the minimum contacts necessary for South Carolina to exercise general personal jurisdiction over First Union and remain consistent with the requirements of due process.[2]

---

2. We do not decide and express no opinion whether First Union would be subject to personal jurisdiction for loans to South Carolina residents or entities or activities of FUNB(SC).

## CONCLUSION

The circuit court properly concluded it did not have personal jurisdiction over First Union. Because South Carolina cannot exercise personal jurisdiction consistent with the limits of due process, we need not decide whether subject matter jurisdiction is proper under the door closing statute. S.C.Code Ann. § 15–5–150 (1976 & Supp.2001).

**AFFIRMED.**

GOOLSBY and HUFF, JJ., concur.