Kalman WEISS, as Assignee,
et al., Plaintiffs,

v.

LA SUISSE, Societe D'Assurances Sur
La Vie, a/k/a La Suisse, Lebens–Versi-
cherungsgelsellschaft,       Lausanne
a/k/a/ La Suisse Life Insurance Com-
pany, Lausanne, Defendant.

No. 97 CIV. 1352(CM)(MDF).

United States District Court,
S.D. New York.

April 22, 2003.

Richard M. Mahon, Drake, sommers, Loev, Tarhis & Catania, P.C., Newburg, Rachell Sirota, Sirota & Sirota LLP, NY, for Hershy Meisels, Yida Weinstock, Chaim M. Rubin, Samuel M. Stern, Moshe Herman, Binie Vizel fka Bini Schwartz, Blima Rosenfeld fka Blima Green, Herman Freund, Idy Weinberger fka Idy Samet, Devorah Herskovits fka Devorah Mermelstein, Avrum Yitschok Gluck, Ester Ekstein fka Ester Zoldan, Mosha Grunfeld, Miriam Klein fka Miriam Leonorovitz, David Rubinfeld, Isaac Goldberger, Shara Yides Salamon fka Yides Rosenbaum, Chavi Engel, Rochama Askenazi, Jacob Hillman, David Fried, Arthur Gluck, As Assignee, Shimon Hirsch, As Parent and Natural Guardian of Moishe Hirsch, A Minor, Abraham Wieder, As Parent and Natural Guardian of Leah Wieder, A Minor, Abraham Wieder, As Parent and Natural Guardian of David Wieder, A Minor, Mordchai Kaufman, As Parent and Natural Guardian of Slava Kaufman, A Minor, Solomon Rubin, As Parent and Natural Guardian of Mendel Rubin, A Minor, Moses Epstein, Cheskel Lunger, As Parent and Natural Guardian of Shmiel Lunger, A Minor, Kalman Weiss, As Assignee, plaintiffs.

Richard N. Chassin, Becker, Glynn, Melamed & Muffly, Richard Niles Chassin, Becker, Glynn, Melamed & Muffly LLP, New York, for La Suisse aka La Suisse, Lebens–Versicherungs–Gesellschaft, Lausanne aka La Suisse Life Insurance Company, Lausanne, Swiss Life aka Swiss Life Insurance and Annuity Company aka Schweizerische Lebensversicherungsund Rentenanstalt, defendants.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs, thirty members of New York's Chassidic communities, bring this action against defendant La Suisse, a Swiss insurance company, under 42 U.S.C. § 1981 ("Section 1981") as well as several contract-related state law claims. This decision is the fifth in a series of decisions dating back to September of 1999. *See Weiss v. La Suisse*, 161 F.Supp.2d 305 (S.D.N.Y.2001) ("*Weiss IV*"); *Weiss v. La*

*Suisse,* 154 F.Supp.2d 734 (S.D.N.Y.2001); *Weiss v. La Suisse,* 131 F.Supp.2d 446 (S.D.N.Y.2001) ("*Weiss II*"); *Weiss v. La Suisse,* 69 F.Supp.2d 449 (S.D.N.Y.1999) ("*Weiss I*"). I now address defendant's motion for summary judgment on plaintiffs' Section 1981 claim.

## BACKGROUND

### I. Facts

I have described the facts of this case in my earlier decisions. I here set forth the facts for the purpose of disposing of this motion for summary judgment. The following facts are either undisputed or interpreted most favorably to plaintiffs.

In the early 1980's, defendant La Suisse sold a life insurance policy in Europe that paid benefits upon the insured's marriage. [Joint Pre-trial Order ("JPTO"), Stipulated Facts ¶ 3].[1] The policy was known as "Profile +256." *Id.* The "Profile +256" was a "marriage endowment policy"—it insured children and paid a benefit when, among other things, the child married. *Id.* at ¶ 4.

In 1989, representatives of La Suisse entered into discussions with representatives of Bituswiss, S.A. ("Bituswiss"), a private corporation with offices in New York, about the possibility of selling marriage endowment policies to Jewish persons in New York.[2] First, the chairman of Bituswiss's board, Dr. Beryz Rosenberg, contacted Josef Widmer, a former La Suisse agent, to ask him whether he could help find an insurance company willing to sell marriage endowment policies. *Id.* at ¶ 7. Next, Widmer contacted Ulrich Riniker, a La Suisse general agent, who then contacted Gerhard Mayer, a La Suisse employee. Riniker asked Mayer if La Suisse would be willing to append its existing marriage rider (referred to as "256") to La

Suisse's "Global E" life insurance policy, and offer this new marriage endowment product through Bituswiss. *Id.* at ¶¶ 7–8. La Suisse agreed to market this new product.

La Suisse began to sell "Global E +256" policies—which I hereinafter refer to as the "Marriage Policies"—through Bituswiss, as well as other brokers, in June of 1989. *Id.* at ¶ 10. The Marriage Policies provided that La Suisse would pay a policyholder either 100,000 or 50,000 Swiss francs upon the occurrence of the earliest of three events: the insured's twenty-sixth birthday, death, or marriage. Policyholders were entitled to request loans from La Suisse and use the value of their policies as security; the interest rate on and amount of any such loan were to be "fixed by La Suisse." The Marriage Policies also provided that policyholders "may be" entitled, when consistent with policy terms, to receive (a) a yearly dividend, or (b) a prorated refund of the annual premium. Finally, the policies stated that "[y]early premiums are due and are based on various factors, including the age of the insured. A typical premium is between [ ] 6,000 and 8,000" Swiss francs. *Id.* at ¶ 15.

On June 16, 1989, Bituswiss and a general agent of La Suisse entered into a subagency agreement that gave Bituswiss the exclusive rights to sell the Marriage Policies in New York State. *Id.* at ¶ 11. On August 10, 1990, Bituswiss and La Suisse entered into a direct broker agreement for the sale of the Marriage Policies. *Id.* at ¶ 12. Bituswiss marketed the Marriage Policies primarily to the Chassidic community. *Id.* at ¶ 16.

Overall, La Suisse's authorized agents (including Bituswiss) sold approximately

---

**1.** The parties have filed a joint pre-trial order, and both refer to the stipulated facts contained therein.

**2.** The sole shareholder of Bituswiss is Elias A. Horowitz, who is licensed to sell insurance products in the state of New York. *Id.* at ¶ 5.

10,000 Marriage Policies. Of those policies, 7,000 were sold to New York residents. *Id.* at ¶ 17. Approximately 99% of the policies sold to New York residents were sold to members of the Chassidic communities in Brooklyn, Monsey, and Kiryas Joel.[3] *Id.* at ¶ 19. Plaintiffs in this case are thirty members of those New York Chassidic communities who purchased La Suisse's "Global E +256" policy through Bituswiss.

Beginning in the early 1990's, La Suisse began to treat the "Global E +256" policyholders differently than holders of what plaintiffs refer to as "Global-type policies"—that is, policies with the Global base but without the "256" marriage rider.[4] First, La Suisse took steps to restrict plaintiffs' borrowing from La Suisse against the value of their Marriage Policies.[5] In 1992, La Suisse started imposing "surcharges" on Marriage Policyholders for policy handling and administration, which they did not impose on other Global policyholders. [Plaintiffs' Opposition 10; Mahon Declaration, Ex. B, at 141; JPTO, Defendant's Contentions ¶ 23(B) ]. Also in 1992, La Suisse started to charge higher interest rates on loans to Marriage Policyholders than it did on loans to other Global policyholders. [Plaintiffs' 56.1 Statement ¶ 11; Mahon Declaration, Ex. F, at 60; Mahon Declaration, Ex. B, at 94–96; Defendant's Memorandum of Law 12]. In 1994 and 1995, La Suisse reduced the loan-to-value borrowing ratio to 65% when the "industry standard" was 90%. [Plaintiffs'

56.1 Statement ¶ 12, 16, 17, 18, 19; Mahon Decl., Ex. D, at 79; Mahon Decl. Ex. B, at 139–40; JPTO, Defendant's Contentions ¶ 23(C) ].

The first marriage claims under the policies came due in or about 1994. [JPTO, Plaintiffs' Contentions ¶ 12]. La Suisse ceased selling the Marriage Policies in June of 1995. [JPTO, Stipulated Facts ¶ 31]. In 1995 and 1996, as marriage claims continued to come due under the policies, La Suisse began to take further actions toward the Marriage Policyholders (in addition to restricting borrowing against the policies) that differed from its actions toward other Global policies. [JPTO, Plaintiffs' Contentions ¶ 17].

### 1. *Special Rules and Regulations*

La Suisse established a "special affairs" team within the life insurance department that promulgated special rules and regulations ("1996 Rules"). [Plaintiffs' 56.1 Statement ¶¶ 3–5, 10]. "Considering the volume of pending contracts and the need to rationalize the administration," the 1996 Rules stated, "we are hereby advising you of the compulsory administrative rules, which take effect immediately." [Mahon Declaration, Ex. E]. Pursuant to those rules, La Suisse no longer accepted telephone or fax inquiries regarding the Marriage Policies, required every written inquiry to be limited to one policy, and prohibited inquiries in list form. The 1996 Rules also addressed the late pay-

---

**3.** The stipulated facts indicate that 99% of the 7,000 policies sold to New York residents were sold to members of the Chassidic community, but it does not address whether the additional 3,000 policies were also sold to members of the Chassidic community. In their motion papers, plaintiffs state that 99% of the policies sold worldwide were sold to Orthodox Jews, although they do not specify whether those policyholders were members of the Chassidic community. [Plaintiffs' Memorandum in Opposition 10].

**4.** I will refer to this group of policies and policyholders as "Global policies" and "Global policyholders."

**5.** Many Marriage Policyholders took loans out under their policies. *Id.* at ¶ 24. Beginning largely in 1992, but as early as 1991, all plaintiffs took loans out under the policies. *Id.* at ¶ 25.

ment of premiums, bulk payments involving multiple premiums for multiple policies, overpayments, and surrender values. Finally, the rules stated: "These rules are compulsory and take immediate effect. We ask to comply with them. The enormous workload for these type policies, compel us to take such measures. Thank you for your understanding." [Mahon Declaration, Ex. E]. The 1996 Rules applied only to the Marriage Policies and not to other Global policies. [Mahon Declaration, Ex. B, at 76].

### 2. Burdensome Claims Procedure

La Suisse established claims procedures and verification processes for the Marriage Policies that were more burdensome than those for other Global policies. [Plaintiffs 56.1 Statement ¶ 6]. More specifically, La Suisse required Marriage Policyholders to produce the following documents in order to prove their right to benefits upon their marriage: (1) a photocopy of their marriage certificate with an apostille;[6] (2) a photocopy of the policyholder's spouse's passport, birth certificate, or any other identification certified by the Swiss Consulate or notarized in the United States; and (3) if the married individuals were not United States citizens, an official document showing that they had residence in the United States (such as an immigration visa, driver's license, social security card, or tax return). [Olson Declaration, Ex. N].[7]

### 3. Suspension of Benefit Payments

La Suisse halted payment of benefits on the Marriage Policies from November 1996 until March 1997. No other Global policies had payment of benefits halted. [Plaintiffs' 56.1 Statement ¶ 8; Defendant's

56.1 Statement ¶ 23; Plaintiffs' Opposition 11; Mahon Decl., Ex. C, at 33].

### 4. Refusal to Pay Pro-rata Premium Refunds

La Suisse declined to refund plaintiffs the pro-rata portion of the premium due for the balance of the year after Marriage Policyholders married and claimed benefits under their policies. [Plaintiffs' 56.1 Statement ¶ 16; Defendant's Motion in Support of Summary Judgment 9]. If a policyholder paid the premium due for the year beginning January 1, 1996, for example, and the policyholder married on July 1, 1996 (six months into the year), La Suisse refused to refund the policyholder half of the premium he paid. La Suisse regularly paid a pro-rata premium refund, however, upon the death of a Global policyholder.

### 5. Non–Payment of Dividends

In 1995, La Suisse ceased paying a dividend to Marriage Policyholders after it successfully petitioned the Swiss Federal Office of Private Insurance for permission to do so. [Plaintiffs' 56.1 Statement ¶ 15; Defendant's 56.1 Statement ¶ 20].

### 6. Summary

La Suisse's reasons for taking these actions vis-à-vis the Marriage Policyholders is the paramount—indeed, the only—issue on this motion for summary judgment. Plaintiffs contend that La Suisse acted as it did at least in part because the plaintiffs were Jewish. In other words, plaintiffs argue that "it was ethnic background that proved to be La Suisse's motivating factor. Not economics, just discrimination." [Plaintiffs' Opposition 7].

---

**6.** An "apostille" is an international method for verification of foreign documents. [Plaintiffs' Opposition 10].

**7.** It is not clear from the record precisely when La Suisse instituted this policy.

## II. Procedural History

In *Weiss I,* I dismissed plaintiff's Section 1981 claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* 69 F.Supp.2d at 460. I did so because plaintiffs had failed to "specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of a racially discriminatory intent." *Id.* (quoting *Yusuf v. Vassar Coll.,* 35 F.3d 709, 713 (2d Cir.1994)). More specifically, I found that:

> plaintiffs have alleged only that defendants "discriminated against plaintiffs based upon their ethnic and racial identity" by refusing to pay benefits and interest due or make loans under the policies, intentionally procuring lapses under the policies, failing to accept payment or recognize policy reinstatement provisions as to plaintiffs, and failing to adequately compensate plaintiffs for defendants' failure to comply with the terms of the policy. The complaint neglects to identify any circumstances or events, apart from plaintiffs' bare allegation, that would, directly or indirectly, link the alleged breaches of contract to plaintiffs' racial identity, and, as such, is "too conclusory to survive a motion to dismiss."

*Id.* (citations omitted).

Plaintiffs subsequently amended their complaint and alleged that defendant discriminated against them based upon their ethnic and racial identity by committing several acts unique to and targeting plaintiffs *as compared to similar insurance policies and policyholders* that La Suisse serviced during the same time period. *Weiss II,* 131 F.Supp.2d at 449–50. Plaintiffs claimed, for example, that defendant (1) refused to pay benefits due under the Marriage Policies, treatment that La Suisse never afforded similar insurance policyholders; and (2) exacted higher interest rates on policy loans compared to other similar insurance policies that La Suisse marketed during the same period. *Id.* Noting that courts in the Second Circuit liberally construe civil rights complaints, I found that plaintiffs had alleged facts sufficient to raise an inference of racially discriminatory intent. *Id.* at 450.

La Suisse now asks the court to dismiss plaintiffs' Section 1981 claim under the relatively more onerous summary judgment standard. The crux of defendant's argument is that plaintiffs have not identified a group of similarly situated individuals that La Suisse treated differently than plaintiffs. In other words, La Suisse argues that plaintiffs have failed to establish a genuine issue of material fact with respect to the allegations that were sufficient at the motion to dismiss stage—that La Suisse treated similarly situated insurance policies and policyholders differently.

At the pleading stage of this lawsuit, I accepted as sufficient plaintiffs' allegations that La Suisse treated their Marriage Policies differently as compared to "other similar insurance policies marketed by La Suisse." Now that plaintiffs argue that those "other similar insurance policies" are any other insurance policies that use the Global base, I turn to whether genuine issues of material fact exist that would allow plaintiffs' Section 1981 claim to proceed to trial.

## DISCUSSION

### I. Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary

judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## II. Defendant's Motion for Summary Judgment on Plaintiffs' Section 1981 Claim is Denied

■ Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981. To establish a claim under Section 1981, a plaintiff must establish that (1) he is a member of a racial minority; (2) the defendant intended to discriminate against him on the basis of race; and (3) the discrimination concerned one or more

of the activities enumerated in the statute (e.g., making and enforcing contracts). *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). The parties do not dispute that the alleged discrimination concerned the making and enforcement of contracts. And individuals of Jewish ancestry are a distinct race for the purposes of Section 1981. *See Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 618, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987). The disputed issue in this case, as in most Section 1981 cases, is whether La Suisse intended to discriminate against plaintiffs on the basis of their race. Plaintiffs claim that La Suisse acted toward them as it did—by, for example, increasing interest rates, making them provide documentation of their marriages, and restricting their access to La Suisse employees—because they were Jewish, not because of economic losses associated with the Marriage Policies.

■ Where, as here, a plaintiff does not allege any direct evidence of discrimination, he must proceed under the well-established burden-shifting framework the Supreme Court developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000).[8] Under that framework, a plaintiff must first establish a *prima facie* case. If the plaintiff establishes a *prima facie* case, "a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory act(s). *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). If the de-

---

**8.** Although *McDonnell Douglas* involved claims of discrimination under Title VII, the burden-shifting framework articulated in that case also applies in suits alleging discrimination under Section 1981. *See Patterson v.* *McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Cartagena v. Ogden Services Corp.,* 995 F.Supp. 459, 461 n. 2 (S.D.N.Y.1998).

fendant bears its burden of production, the presumption of discrimination "drops from the picture" and the plaintiff "must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock,* 224 F.3d at 42.

La Suisse argues that plaintiffs fail to establish a *prima facie* case. Upon a review of the record, I too harbor doubts whether plaintiffs carry their burden under the first phase of the *McDonnell Douglas* framework. I decline to decide the case on that basis, however, for two primary reasons. First, "[t]he burden on the plaintiff of presenting a prima facie case under *McDonnell Douglas* is 'minimal.'" *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001) (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000)). Second, as Judge Sotomayor explained in *Lanahan v. Mut. Life Ins. Co. of New York,* 15 F.Supp.2d 381 (S.D.N.Y.1998), "the only purpose served by the prima facie case is to force the defendant to articulate a non-discriminatory reason for the termination, and ... it is the rare case in which a defendant will not have proffered such a reason." *Id.* at 384. As a result, I join an increasing number of courts in this Circuit and assume, without deciding, for purposes of this motion only, that plaintiffs have established a *prima facie* case. *See, e.g., Devlin v. Transp. Communications Intern. Union,* 2002 WL 413919, at *7 (S.D.N.Y. Mar.14, 2002); *Lanahan,* 15 F.Supp.2d at 384; *Lapsley v. Columbia Univ. Coll. of Physicians & Surgeons,* 999 F.Supp. 506, 514–15 (S.D.N.Y.1998); *see also Roge,* 257 F.3d at 168 (declining to reach question of whether plaintiff established a *prima facie* case because defendant met its burden of putting forth legitimate, nondiscriminatory reasons and plaintiff failed to proffer sufficient evidence of pretext).

## A. Defendant's Articulation of Legitimate, Nondiscriminatory Reasons for its Conduct

Once a plaintiff establishes a *prima facie* case, a defendant must produce evidence that its adverse actions toward plaintiff occurred for some legitimate, nondiscriminatory reason. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 102 (2d Cir. 2001). A defendant "need not persuade the court that it was motivated by the reason that it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998). In other words, it is a burden "of production, not persuasion." *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. La Suisse satisfies this burden by offering the following reasons for its conduct.

### 1. *Restricted Borrowing*

La Suisse contends that, in contrast to holders of other types of insurance policies, Marriage Policyholders systemically declined to pay annual premiums in favor of taking out policy loans. According to defendant, the Marriage Policyholders stood to gain annual returns of 17% on their policies because they would marry at ages far lower than the statistical assumptions La Suisse had used to set premiums. It was therefore profitable for them to borrow money from La Suisse, at interest rates between 6.5 and 8%, to pay their premiums. [Defendant's Motion for Summary Judgment 9–10]. La Suisse contends that it was confronted, as early as 1991, with the "unprecedented prospect" of not receiving premium revenues as projected. *Id.* at 10. As a result, La Suisse claims that it took steps (such as raising

the interest rate on loans) to discourage Marriage Policyholders from taking loans and to encourage them to pay premiums. *Id.* at 12.

### 2. *Special Rules and Regulations*

La Suisse contends that it formulated the 1996 Rules to streamline the information to brokers and alleviate the large workload the Marriage Policies generated. [Defendant's Motion for Summary Judgment 14–15]. The face of the document suggests as much, stating that "[t]he enormous workload for these type policies, compel us to take such measures." [Mahon Declaration, Ex. E]. The Deputy Director of La Suisse's Life Group, Luigi Schiattino, testified that he had seven or eight people working on the 10,000 Marriage Policies, while he had fifteen people working on the additional 110,000 policies under his management. *Id.* [Olson Decl., Ex. P. 114].

### 3. *Burdensome Claims Procedure*

La Suisse argues that it required Marriage Policyholders to provide documentation of their marriages because its president, Roland Chlapowski, received reports from a Chassidic broker, Moses Kraus, that sham marriages were occurring. [Olson Decl., Ex. F 113].

### 4. *Suspension of Benefit Payments*

According to La Suisse, it temporarily suspended management of the Marriage Policies in December 1996 when it faced projected losses of over 300,000,000 Swiss francs and its investigation had raised doubts about the validity of the policies. [Defendant's Motion for Summary Judgment 7]. The suspension lasted until March of 1997, at which time La Suisse resumed management of the Marriage Policies while continuing to reserve its right to challenge the validity of the insurance contracts.[9] As a result of the suspension, La Suisse did not process seven of the plaintiffs' payment orders, which they submitted in November 1996, until February or March of 1997. La Suisse contends that all policyholders have received the full face amounts of their policy benefits due, and that it paid all other plaintiffs (besides those seven) within thirty days after they submitted the necessary paperwork. [Defendant's Motion for Summary Judgment 7–8]. Plaintiffs do not contest that they have all been paid the face amount of the benefits due under their policies and that all but seven of them received payment within thirty days.

### 5. *Refusal to Pay Pro-rata Premium Refunds*

La Suisse argues that the terms of the Marriage Policies provided for a pro-rata premium refund upon only the policyholder's death. This was apparent from the face of the policy, which states that "La Suisse will refund to the beneficiary any part of the periodic premium not used at the end of the insurance month during which the insured died." [Olson Decl., Ex. H, at § 22.2]. Thus, La Suisse contends that it did not offer such a refund upon a policyholder's marriage because "[m]arriage simply [was] not an event under the contract for which this benefit [was] due." [Defendant's Motion for Summary Judgment 9]. La Suisse alleges that it pays a pro-rata premium refund to Marriage Policyholders upon death. [Defendant's Reply 7].

---

9. On December 16, 1996, the Commercial Court in Zurich found, in an oral decision, that the Marriage Policies were void or voidable under Swiss law. The court issued its written decision on July 2, 1997. The Federal Supreme Court reversed the decision on June 11, 1998. [Olson Declaration, Ex. E].

### 6. *Non–Payment of Dividends*

La Suisse argues that the Marriage Policies generated massive losses, and under Swiss law dividends are calculated as a share of a company's profits. As a result, it asked for (and received) permission from the Swiss Federal Office of Private Insurance ("FOPI") to cease paying dividends on the Marriage Policies. [Defendant's Motion for Summary Judgment 16].

The Swiss Federal Appellate Commission for the Supervision of Private Insurance dismissed an appeal of the FOPI's decision in a decision dated April 18, 2002. The Commission found that La Suisse suffered massive deficits due to its miscalculation of the marriage risk, and upheld FOPI's approval of La Suisse's cessation of dividend payments because "surplus sharing can exist only if surpluses arise." The Commission also ruled that "[t]he basic insurance policies coupled with the marriage supplement insurance are not the same thing as the 'basic-only insurance polices' [sic]; they must thus be handled in a correspondingly dissimilar manner. This 'unequal treatment' is not discrimination but rather is in accord with the principle of legal equality."

### 7. *Summary*

The minutes of a 1995 La Suisse board meeting sum up its position that the basis for any differential treatment between Marriage Policyholders and other Global-based policies was economic. The minutes indicate that Roland Chlapowski gave a presentation where he described the structure of the Marriage Policies and "the accumulated risk, because it is taken by an Orthodox Jewish clientele, which practices marriages at ages much younger than those indicated by statistics." [Mahon Decl., Ex. H]. As a result, the Marriage Portfolios (according to Chlapowski's presentation) presented "a potential for losses that could go up to 250 million [Swiss francs], between 1997 and 2003." *Id.* Chlaplowski also explained "the history of the measures taken to reduce the production, elimination of excess interest in the main insurance, establishment of conditions to discourage loans against policies and, finally, preparation of legal defense with [a] lawyer." *Id.* The minutes also indicate that a La Suisse board member, Georges Muller, "confirm[ed] to the Board that the company was misled from the beginning as to the marriage age of the Orthodox Jewish population as compared to the Jewish population at large, an error that was intentionally exploited by the brokers." *Id.*

## B. Plaintiffs' Evidence of Pretext and Discriminatory Intent

Because defendant has satisfied its burden of production, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James*, 233 F.3d at 156. In other words, I must examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir.2001) ("The court must examine the entire record to determine if plaintiffs meet their ultimate burden of persuading the fact-finder of a central element of a 1981 claim: namely, that defendants intentionally discriminated against them on the basis of their race.").

Plaintiffs offer three arguments that they contend support a reasonable inference that La Suisse discriminated against them because they were Jewish. They argue that (1) La Suisse's different treat-

ment of similarly situated non-minority policyholders creates an inference of discrimination; (2) La Suisse's knowledge, as early as 1990, that the holders of Marriage Policies were Jewish tends to demonstrate that defendant discriminated against them because of their race; and (3) internal documents regarding La Suisse's calculation of Marriage Policy premiums demonstrate that La Suisse's proffered non-discriminatory reasons are false and discrimination was its true motivation. I address these arguments in turn.

### 1. Evidence that La Suisse Treated Other Policyholders Differently than the Marriage Policyholders Does Not Raise an Inference of Discrimination

■ Plaintiffs argue primarily that La Suisse gave preferential treatment to similarly-situated non-minority policyholders. This is, of course, a well-established means of creating an inference of discrimination. *See, e.g., Lizardo,* 270 F.3d at 101; *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997). As Judge Mukasey explained in a factually similar case,[10] "facts which would create an indirect inference of discrimination—and thereby perform the same function as the prima facie factors in an employment discrimination case—include that plaintiffs fulfilled all of their obligations under the contract and that similarly situated non-minority people received the benefits of the contract which

plaintiffs were denied." *Dickerson v. State Farm Fire & Casualty Co.,* 1997 WL 40966, at *2 (S.D.N.Y. Feb.3 1997).[11]

The logic behind this inference is that if two people who are similarly situated *in all material respects,* except for the fact that one is a member of a protected class and the other is not, are treated differently, the differential treatment is more likely than not due to their respective races. Indeed, that is precisely the argument that plaintiffs make. Plaintiffs compare themselves to a group that consists of all holders of La Suisse's policies that have a Global base, minus other Marriage Policyholders. Plaintiffs contend that they are similarly situated to those policyholders because the Marriage Policies were created by simply adding a marriage rider to La Suisse's "Global Policy," one of La Suisse's longstanding base policies. The rest of plaintiffs' argument follows from this comparison: the Marriage Policyholders were 99% Chassidic Orthodox Jews; La Suisse knew that to be the case; no other Global policyholders suffered the same adverse treatment as the Marriage Policyholders; therefore "La Suisse's treatment of the marriage policyholders was ... motivated by ethnic identity." [Plaintiffs' Memorandum of Law 6].

Plaintiffs have indeed shown that they are members of a protected class and that La Suisse treated them differently from

---

**10.** In *Dickerson,* two African–American plaintiffs sued defendant insurance company under Section 1981, claiming that defendant imposed conditions on performance of plaintiffs' insurance policy that were different and more burdensome than those imposed on similarly situated white claimants.

**11.** Courts have discussed the meaning of the phrase "similarly situated" largely in cases analyzing the *prima facie* phase of the *McDonnell Douglas* burden-shifting framework. That distinction, however, is irrelevant when a Court is determining whether a plain-

tiff has offered evidence so that a reasonable jury could conclude that he has satisfied his "ultimate burden" of showing that defendant intentionally discriminated against him. As I described above, a court making that consideration must consider the total record, which includes "the strength of the plaintiff's prima facie case, the probative value of the proof that the [defendant's] explanation is false, and any other evidence that supports [or undermines] the [defendant's] case." *James,* 233 F.3d at 156 (quoting *Reeves,* 530 U.S. at 149, 120 S.Ct. 2097).

other Global policyholders. But plaintiffs fail to offer the evidence necessary to complete the line of inductive reasoning.

First, they have not adduced evidence that the other Global policyholders were non-minorities. The record reveals nothing about the ethnic background of those who purchased other types of Global policies. It is entirely possible that some holders of Global policies other than the Marriage Policies were Jewish; it is even possible that some were members of an Orthodox or Chassidic community. Different treatment of similarly situated individuals within the same protected class does not create an inference of discrimination.

Second, plaintiffs have not shown that they were "similarly situated" to other Global policyholders. In order to be considered "similarly situated" pursuant to Second Circuit precedent, the non-minority individuals with whom plaintiffs attempt to compare themselves "must be similarly situated in all *material* respects." *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997) (emphasis added). The plaintiffs and (allegedly) similarly situated individuals' "circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo,* 270 F.3d at 101 (citing *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir.2000)). "In other words, there should be an 'objectively identifiable basis for comparability.'" *Graham,* 230 F.3d at 41 (quoting *Cherry v. American Tel. & Tel. Co.,* 47 F.3d 225, 229 (7th Cir.1995)). Overall, "[w]hat is key is that they be similar in significant respects." *Lizardo,* 270 F.3d at 101.

Here, plaintiffs fail to demonstrate *anything* about the Global policies other than the fact that they have the same "base" as the Marriage Policies. From this, plaintiffs jump to the conclusory assumption that "[t]he *only* difference to the marriage policies was the rider." [Plaintiffs' Opposi-

tion 16] (emphasis added). But there is no evidence to support that statement. In fact, testimony quoted by plaintiffs contradict it. David Burkhard, a La Suisse employee who worked in defendant's life insurance department, came to be in charge of the "special affairs" group that handled the Marriage Policies. He testified at his deposition that he had encountered "probably dozens" of policies that use the Global as a base policy "because since there are tariffs, so many riders, so many combinations." [Mahon Decl., Ex. B, at 35]. It is sheer speculation to assume that the addition of these various combinations of tariffs and riders resulted in the creation of policies that were "similar" in all material respects.

In addition, defendant points out that plaintiffs' Marriage Policies used as their base a "Global E" insurance policy. The "Global E" policy is a base life insurance policy issued to minors—the "E" stands for "enfant," which means "child" in French. [Defendant's Reply 3 n. 3]. Some of the other Global policyholders to whom plaintiffs compare themselves, however, held policies that had Global adult bases. [Defendant's Reply 3]. Presumably, the terms of adult policies differ from those devised for minors. Plaintiffs make no distinction between their "Global E +256" policies and policies with adult Global bases.

Yet even assuming that the only difference between plaintiffs' policies and other Global policies was the marriage rider, plaintiffs still fail to demonstrate that the other Global policyholders were similarly situated. I know nothing, for example, about whether the other Global policies offered similar benefits (such as payment of a pro-rata share of the premium); were similarly profitable (or, in this case, unprofitable); or created a similar workload for La Suisse. If La Suisse had another

product that resulted in massive economic losses and promised to lead to more, that consumed excessive administrative time, and that offered similar benefits—but did not institute similar restrictions, administrative procedures, and payment suspensions for those policies—then (assuming plaintiffs could show that this other product was sold to non-Jewish individuals), an inference of discrimination would arise. But there is no such evidence in this record.

I recognize that whether individuals "are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39. But given the complete absence of any evidence of similarity (other than that they shared the same Global base), "plaintiffs have not offered sufficient evidence from which a jury could reach that conclusion." *Lizardo*, 270 F.3d at 101.

*Lizardo*, where plaintiffs offered a greater quantum of evidence than plaintiffs do here, provides a useful comparison. In order to prove that Denny's denied them service due to their race, the seven Asian–American *Lizardo* plaintiffs identified three groups of individuals who were seated before them, as well as the number of individuals in those groups and their race. *Id.* The court found, however, that the record was devoid of evidence that the tables at which those groups were seated could have accommodated plaintiffs' larger party. The African–American *Lizardo* plaintiffs—who left the restaurant to observe a melee outside, returned, and then were ejected after complaining (using profanity) about the conduct of security guards—argued that Denny's did not eject a similarly situated white patron after he behaved just as egregiously. The court

determined that plaintiffs were not similarly situated to the white patron because he did not directly confront the restaurant manager using profane language. *Id.* at 104–05. In other words, plaintiffs' showing in this case falls well below the greater quantum of evidence plaintiffs produced in *Lizardo*—a quantum of evidence that the Second Circuit found insufficient.

### 2. Evidence that La Suisse Knew that the Policyholders Were Jewish Does Not Support an Inference of Discrimination

Plaintiffs offer evidence that they argue establish La Suisse knew that the Marriage Policyholders were Jewish. First, plaintiffs cite a letter, apparently sent from La Suisse to the Marriage Policyholders,[12] which states:

It is La Suisse's position that [the Marriage Policies] are void or voidable based on a number of legal grounds .... In particular, [independent] brokers have marketed these policies in communities in which marriages are arranged at an extremely early age (between 17 and 19, and even as early as 15) among children of these communities by the parents (or intermediaries); moreover, the marriage of all children within these communities is virtually assured, as it is arranged by the parent; the brokers and the policy holders or their representatives, knew—but did not inform La Suisse accordingly—that the marriage of the insured child would be arranged at such an early age.

[Mahon Decl. Ex. A]. Plaintiffs argue that this letter establishes that "La Suisse questioned policy validity based entirely upon the ethnicity of an insular Jewish group." [Plaintiffs' Opposition 9]. It does no such thing. Rather, the letter informed

---

**12.** The letter states: "We are writing to you in your capacity as holder of the above-mentioned policy (mixed life insurance policy, with marriage-event clause, providing for the advance payment of insured capital in case of marriage prior to the insurance termination date)." [Mahon Decl. Ex. A].

the Marriage Policyholders of La Suisse's position that the policies were void or voidable because the brokers failed to inform them that were selling them to individuals who were all but sure to marry at an early age. This letter evinces no racial animus or discriminatory intent. It expressed pique at having been duped.

Second, plaintiffs cite the deposition testimony of La Suisse employees. Luigi Schiattino testified, for example, that he inferred from the Marriage Policyholders' names that they were Jewish. [Plaintiffs' Opposition 12; Mahon Decl. Ex. C, at 81, 98–99]. Similarly, the Chairman of La Suisse's Board of Directors, Georges Muller, testified that he knew the Marriage Policyholders were Jewish as early as 1990. [Plaintiffs' Opposition 13; Mahon Decl. Ex. F, at 32–33, 51–52, 82–83]. Indeed, the record reveals that the policies were created at the request of a broker who wanted to sell them to Jews, so it would be all but impossible to conclude that La Suisse was unaware that most, if not all, of their customers were Jewish. And La Suisse does not contest knowing that these policies were sold almost exclusively to Jews. [Defendant's 56.1 Statement ¶ 7; Defendant's Reply 6].

■ A defendant's knowledge of a plaintiff's race may be necessary to prove discriminatory intent. *See Robinson v. Adams,* 847 F.2d 1315, 1316 (9th Cir.1987). But it is not, without more, *sufficient* to support such an inference. Indeed, it is not even sufficient to establish a *prima facie* case. If that were the case, then a minority employee would be able to establish a *prima facie* case as long as his employer fired him and knew that he was a member of a protected class. In order to support an inference of discrimination, knowledge of a plaintiff's race must exist

in tandem with other circumstances. Thus, in the employment context, the fact that a minority employee was fired *and* replaced with a Caucasian individual is sufficient to establish a *prima facie* case. *See Tarshis v. Riese Org.,* 211 F.3d 30, 36 (2d Cir.2000). Defendant's knowledge that plaintiffs were Jewish, by itself, is insufficient to either raise an inference of discrimination or show that La Suisse's legitimate economic reasons were not its true motivation.

### 3. Evidence Concerning La Suisse's Calculation of Premiums

■ Finally, plaintiffs contend that discriminatory animus toward holders of the Marriage Policies as Jews can be inferred from evidence about how La Suisse set the premiums for those policies. They point to three internal La Suisse memoranda from 1990, all of which indicate that La Suisse may have calculated premiums for the Marriage Policies with an actuarial pool consisting of Israeli Jews. [Mahon Decl., Exs. I, J, K].[13]

The first memo, dated January 24, 1990, appears to compare what La Suisse's yield would be if purchasers of "endowment life insurance with additional marriage insurance" married at the rate of the general Swiss population with what La Suisse's yield would be if policyholders married at the rate of Israeli Jews. [Mahon Decl., Ex. I].

La Suisse employees met to discuss the January 24 memo, and decided that "the individual endowment life/marriage insurance product designed for the Swiss market does not offer sufficient guarantees to insure foreigners, in the event that their behavior is dictated by the lure of the yield obtained as a result of an early marriage."

---

**13.** It is not clear from the record whether the rates were set in this way; what is clear is that doing so was discussed.

[Mahon Decl., Ex. J].[14] As result, instead of creating "a new additional marriage insurance, which would involve a new rate and new conditions," La Suisse decided to "apply a refundable premium—without a commission or dividend—in the event that the policy reaches maturity, and limit the entry age and/or duration that we offer to foreigners." *Id.* The second memorandum, dated February 23, 1990, calculated the "additional marriage premium for all possible ages and durations, based on the assumption that the probability of marriage is ten times" that of the statistics they had for Israeli Jews. *Id.*

La Suisse employees then met again to discuss the February 23 memorandum. They decided that "the yield of endowment life/marriage insurance for residents abroad should be subject to an additional premium that is not excessive compared to the premium for the basic scheme." [Mahon Decl., Ex. K]. The third memo, dated March 7, 1990, addressed the calculation of the "additional premium." *Id.* "In order to establish the amount of the additional premium," the memo states, "the question regarding the policy's yield—from the buyer's point of view—must be taken into account: it must be as close as possible to the yield obtained by a Swiss person and

must not fall below zero." *Id.* As a result, La Suisse decided to adopt "the additional premium [for the Marriage Policies] for which the yield in the case of marriage at 16 years of age is 80% of that obtained for a Swiss person under the same circumstances." *Id.*

Plaintiffs do not contend that La Suisse discriminated against them in setting the terms (i.e. premium amounts) of the Marriage Polices.[15] However, they base two arguments concerning the administration of these policies in later years on these memoranda. First, they argue that they establish that La Suisse knew that the policyholders were Jewish well before 1995. [Plaintiffs Memorandum of Law 7]. As I explained above, however, La Suisse does not dispute that it knew the policyholders were Jewish as early as 1990—indeed, La Suisse stipulated that it created this product so that Bituswiss could offer it to a Jewish market in New York. [JPTO, Stipulated Facts ¶ 6]. Defendant's knowledge of plaintiffs' race does not in and of itself support an inference of discrimination.

Second, plaintiffs argue that the memoranda show that La Suisse considered the possibility that policyholders would marry as early as age sixteen. [Plaintiffs' Memo-

14. The three memoranda use the term "foreigners" to refer to two groups of Jews: the Israeli Jews whose marriage probability rates La Suisse used to make its actuarial calculations, and the Jewish individuals who La Suisse anticipated were going to buy the Marriage Policies.

15. Neither in the Complaint, nor in the Joint Pretrial Order, nor in any of the their motion papers do plaintiffs allege or argue that La Suisse's use of Israeli Jews' marriage rates to calculate policy premiums violates Section 1981. Had they made such an allegation when the complaint was filed in 1997, it most likely would have been time barred under the three year statute of limitations applicable to Section 1981 claims. *See King v. American Airlines, Inc.,* 284 F.3d 352, 356 (2d Cir.

2002). Any such allegation would have opened up a fascinating can of worms concerning the interplay between American anti-discrimination statutes as they apply to actuarial calculations (*see, e.g.,* Martin J. Katz, *Insurance and the Limits of Rational Discrimination,* 8 Yale L. & Pol'y Rev. 436, 437–38 & nn. 7–9 (1990); Jill Gaulding, Note, *Race, Sex, and Genetic Discrimination in Insurance: What's Fair,* 80 Cornell L.Rev. 1646, 1653–56, 1658–60 (1995); Robert H. Henry, II & Kyle B. Mansfield, *Justifying Unisex Insurance: Another Perspective,* 34 Am. U.L.Rev. 329, 350–53 (1985)) and the regulation of Swiss insurance companies writing policies that are governed by Swiss law. Neither side contends, however, that such issues are before the Court.

randum of Law 7]. Although they never quite come out and say so, plaintiffs implicitly argue that the memoranda show that La Suisse's proffered nondiscriminatory reason—that it did not know policyholders would marry at such an early age, and that it therefore incurred unexpected massive losses—is false.

Of course, the memoranda do not tend to show that La Suisse *expected* large numbers of Marriage Policyholders to marry at ages as early as sixteen. But they do show that La Suisse used ages as low as sixteen as a fixed variable when performing actuarial calculations using a population (Israeli Jews) that does not tend to marry as young as the Chassidic population. This is enough (albeit barely enough) to get plaintiffs to trial on the issue of pretext.

### CONCLUSION

For the reasons stated above, La Suisse's motion for summary judgment on plaintiffs' Section 1981 claim is denied.

This is the decision and order of the Court.